Leo H. AULT and Virginia Ault, his wife, Plaintiffs and Respondents,

v.

Wayne DUBOIS, dba Rush Valley Boys Home, Defendant and Appellant.

Leo H. AULT and Virginia Ault, his wife, Plaintiffs and Appellants,

v.

Wayne DUBOIS, dba Rush Valley Boys Home, Defendant and Respondent.

Nos. 860024–CA, 860028–CA.

Court of Appeals of Utah.

July 10, 1987.

Jackson Howard, Howard, Lewis & Petersen, Provo, Heber Grant Ivins, American Fork, for plaintiffs and appellants.

William J. Hansen, Christensen, Jensen & Powell, Salt Lake City, for defendant and respondent.

Before ORME, JACKSON and BENCH, JJ.

## OPINION

ORME, Judge:

Dubois appeals a jury verdict against him, awarding $40,000 in damages to the Aults for his voluntary waste of their property. We affirm.

## FACTUAL BACKGROUND

In May of 1972, Dubois contacted Mr. Ault and together they agreed that Ault would rent a house and 30 acres of land in Vernon, Utah to Dubois for use as a boys' ranch. There was no written agreement, and Dubois became a tenant on a month-to-month basis. Rent for the house and land was a modest $300 per month. There is some disagreement as to the condition of the house and land at commencement of the tenancy. The Aults testified that the home was built in 1888, that it had been listed on the Utah Historic Register since 1974, and that it was currently being considered for listing on the National Register of Historic Places. Mr. Holland, employed by the State Division of Youth Corrections, testified that it was "a beautiful old home, very, very attractive." On the other hand, Dubois stated that the condition prior to his possession was extremely poor. According to him, the premises had apparently been left unsecured, and multiple loads of debris and garbage had to be removed from the area. The jury apparently credited the Aults' version over that offered by Dubois.

The tenancy pursuant to the oral agreement continued for 10 years. In January of 1982, after disagreements developed with the Aults, Dubois relocated his boys' ranch to Fairfield, Utah. On or around January 7, Dubois vacated the home, leaving it unlocked. On January 11, Dubois notified the Aults of his leaving. On January 12, the Aults retook possession of the home and found it in shambles. The doors were left open, windows were broken, the heat had been turned off, and freezing conditions had resulted in broken pipes.

The havoc included a damaged fireplace, broken doors, broken locks, damaged door frames, broken windows, missing doorknobs, broken light fixtures, large holes in the walls, and ripped wall paneling. In addition to the damage to the house itself, there were holes in the barn roof, bricks had been removed from the barn and the milk house, a granary which had once been the Vernon Post Office had been burned down, the irrigation system was damaged, and thirty eight trees had died because of insufficient watering or, at least in one case, as a result of being used by the residents for ax or hatchet practice. Personal property belonging to the Aults, including roofing materials, chicken feeders, corrugated tin, a wheel barrow, two oak tables, a dining set, and a phonograph were also damaged.

Dubois attributed the damage to acts of vandalism occurring after he vacated. The Aults filed insurance claims for damages caused by vandals, primarily for the broken windows, and received $4,800.[1]

Aults then brought suit against Dubois to recover damages to the property and Dubois counterclaimed, seeking compensation for improvements made while he was in possession. By special verdict, the jury awarded the Aults $40,000 to compensate them for the damages caused by Dubois' voluntary waste.

Dubois raises three main issues on appeal. First, he contends that the trial court erred in allowing the Aults to testify to the cost of repair or replacement instead of diminution in value for permanent damages to real property and by allowing testimony on repair or replacement costs instead of fair market value for damages to personal property. Second, Dubois argues that the Aults failed to establish who had legal or constructive possession of the property at the time of the "vandalism." Third, Dubois argues that he was prejudicially surprised at trial by the Aults' claim for $56,000 in damages, when the original complaint, bolstered by Mr. Ault's deposition, fixed the claim at $25,000.[2]

On cross-appeal, the Aults argue that under Utah Code Ann. § 78-38-2 (1987), they were entitled to treble the actual damages found by the jury.

## MEASURE OF DAMAGES

### A. *Damages to real property*

■ Generally, the measure of damages for permanent injury to land is the difference in the market value of the land immediately before and immediately after the injury, but if the land may be restored to its original condition, the cost of restoration may be used as the measure of damages if it does not exceed the diminution in the market value of the land. *Blanton and Co. v. Transamerica Title Ins.*, 24 Ariz.App. 185, 536 P.2d 1077, 1080 (1975); *Duckett v. Whorton*, 312 N.W.2d 561, 562 (Iowa 1981). *See* Annotation, *Measure of Damages in Landlord's Action for Waste Against Tenant*, 82 A.L.R.2d 1106, 1108 (1962). *See also Leishman v. Kamas Valley Lumber Co.*, 19 Utah 2d 150, 152, 427 P.2d 747, 749 (1967) (If the cost of restoration for real property is less than the diminution of value, courts should award the cost of restoration.).[3]

The trial court adequately advised the jury of the applicable law by the following jury instruction:

When damage to real property is of a temporary nature and is of such a character that the property can be restored to its original condition, the measure of damages is the reasonable cost of repair necessary to restore the property to its original condition, plus a reasonable amount to compensate for the [loss of use or diminution of rental value] of the property during the time reasonably required for the making of repairs; provided, however, that such sum does not exceed the difference between the market value of the property immediately prior to and immediately following the injury.

■ The fact that the Aults introduced evidence on the cost of repairs, through numerous expert witnesses, to the exclusion of evidence of the diminution in value, does not require reversal. Where damages to realty may be measured either by dimi-

---

1. Contrary to the apparent view of Dubois, the claim as filed by the Aults does not tend to show that they sustained comparatively little damage. Apparently the insurance policy covered losses caused by vandalism while excluding coverage for willful damage caused by parties in possession. Most of the Aults' losses were not necessarily consistent with a claim of vandalism.

2. Dubois additionally complains about alleged juror misconduct. That contention is without merit.

3. Diminution in value should probably not be viewed as an inflexible ceiling on recoverable damages. *See, e.g., Advanced, Inc. v. Wilks,* 711 P.2d 524, 527 (Alaska 1985) (Where property has special significance to the owner and repair seems likely, the cost of repair may be appropriate even if it exceeds diminution in value.).

nution in value or by the cost of restoration, and the plaintiff gives evidence only as to one, it is up to the defendant to show that the other measure of damages would be less. *Jowdy v. Guerin*, 10 Ariz.App. 205, 457 P.2d 745, 750 (1969). *See Advanced, Inc. v. Wilks*, 711 P.2d 524, 526 (Alaska 1985) (If defendant thought that cost of repairs was an unreasonable measure of damages given what he believed to be the relatively small decrease in value, defendant had burden to present evidence of diminution in value.); *Laska v. Steinpreis*, 69 Wis.2d 307, 231 N.W.2d 196, 200 (1975) (not claimant's burden to produce evidence of both cost of repairs and diminution in value so that the trial court or jury can determine the lesser). In the present case, Dubois introduced no evidence to show that diminution in value would be less than the cost of repairs for the damage to the real property.

 Moreover, even when diminution in value is clearly the appropriate measure of damages, evidence as to repair costs is admissible for the purpose of helping the jury determine the loss of value.[4] *See Johnson v. Northwest Acceptance Corp.*, 259 Or. 1, 485 P.2d 12, 16–17 (1971). *See also Powers v. Taylor*, 14 Utah 2d 452, 379 P.2d 380, 381–82 (1963).

## B. *Damage to trees*

 For damage to trees, the general rule is that for ornamental trees or shrubbery, damages are awarded for diminution in value, and for essential trees, reasonable restoration damages are awarded. *Pehrson v. Saderup*, 28 Utah 2d 77, 79, 498 P.2d 648, 650 (1972).[5] However, in *Pehrson*, the Supreme Court explained that there is no inflexible rule as to the appropriate measure of damages to trees, and

the court awarded diminution-in-value damages not simply because lilacs are ornamental, but because the cutting down of lilac trees on the border of the owner's property was not malicious or wanton, but merely the result of mistake. *Id.* at 650. In addition, the court took account of the fact that the owner's proposals for restoration were unreasonable. *Id. See Brereton v. Dixon*, 20 Utah 2d 64, 66, 433 P.2d 3, 5 (1967).

 In the present case Paul Engh, a respected nursery operator, testified that it would cost more than $7,000 to replace the trees, which—with some spruce, some pine, and twelve apple—were a combination of "ornamental" and "essential" trees. *See* Note 5, *supra.* The court properly admitted his testimony with the proviso that the testimony and related exhibit were only offered to prove the replacement or restoration cost, which ought to be available to the jury, and not actual liability. *See* Note 4, *supra.* Dubois chose to offer no evidence concerning any diminution in the property's value resulting from the loss of the trees or concerning a lower restoration price-tag.

## C. *Damages to personal property*

 For personal property, such as the destroyed oak tables, damages are ordinarily based on market value at the time of taking or destruction.[6] *Winters v. Charles Anthony, Inc.*, 586 P.2d 453, 454 (Utah 1978). Market value is equal to the retail price if the item is marketable. *Id.* Dubois contends that the Aults limited their evidence to replacement or repair cost rather than value at the time of destruction or damage.

 In the present case, cost of replacement may have been the only evidence available for the jury in determining the

---

4. In such a case, the jury should be instructed that while it has heard evidence about repair costs, it is not entitled simply to total these costs and thereby come to a damage figure. Rather, it should be expressly instructed that it may consider the evidence about repair costs, along with all other evidence it has heard, in deciding the amount by which the property was reduced in value.

5. Essential trees are defined in *Pehrson* as "essential to the planned use of property for a homesite in accordance with the taste and wishes of [their] owner." 498 P.2d at 650 (quoting *Thatcher v. Lane Construction Co.*, 21 Ohio App.2d 41, 254 N.E.2d 703, 708 (1970)).

6. The point made in Note 3, *supra*, would appear to apply to personal property as readily as to real property.

fair market value of the destroyed items. It was difficult for the Aults to know when during the ten year tenancy the damage occurred. And the desired objective of damages is "to evaluate any loss suffered by the most direct, practical and accurate method that can be employed." *Even Odds, Inc. v. Nielson,* 22 Utah 2d 49, 448 P.2d 709, 711 (1968). Moreover, Dubois did not introduce any other evidence to prove the fair market value of the damaged property. Juries are generally allowed wide discretion in assessment of damages, *Amoss v. Broadbent,* 30 Utah 2d 165, 514 P.2d 1284, 1287 (1973), and we see no clearly prejudicial error in admitting the repair or replacement evidence.[7] *See* Note 4, *supra.*

## LIABILITY FOR ACTS OF VANDALS

■ Dubois contends that he left the property in fine condition and has been made a scapegoat for vandals who descended upon the property and ruined it after he and his boys had left. Even if this were true, Dubois had legal possession of the property at the time of its ruination and therefore a duty to safeguard it. *See* 49 Am.Jur.2d *Landlord and Tenant* § 922 (1970). The record shows that regardless of the time Dubois' agents vacated the house without prior notice to Aults, admittedly leaving it unlocked, the Aults were not informed of their leaving until January 11, 1982, at which time the property was vacant and had probably been so for three or four days. The Aults retook possession, upon learning the property had been abandoned, as expeditiously as possible. Upon their arrival and retaking possession, the damage had already been done. Under such circumstances Dubois, not the Aults, bears the liability for losses resulting from any acts of vandalism occurring between his unilateral and undisclosed abandonment and the Aults' repossession.[8] *Cf. Centurian Development Ltd. v. Kenford Company, Inc.,* 60 A.D.2d 96, 400 N.Y.S.2d 263, 267 (App.Div.1977) (tenant who vacated liable for damages caused by lack of heat when it discontinued gas service without notifying landlord).

## SURPRISE

Dubois also argues that he was unfairly surprised by the amount of damages for which evidence was introduced at trial. In their complaint, the Aults pleaded $25,000 in general damages and $10,000 in consequential damages. Although a Rule 15(a) amendment to the pleadings to increase the amount of the claimed damages or a Rule 15(b) amendment to conform to the evidence presented would have been appropriate, it was not necessary. 6 C. Wright and A. Miller, *Federal Practice and Procedure* § 1474 at 385–86 (1971). *See* Utah R.Civ.P. 15. *See also* Utah R.Civ.P. 54(c)(1).

■ As for the alleged "gentlemen's agreement," made during Mr. Ault's deposition, that Aults' counsel would furnish a list of damages, Dubois had plenty of time to make other arrangements to secure the information when it became clear counsel had welched on his agreement. Dubois could readily have sent interrogatories requesting detailed information about damages. A surprise at trial which could have been easily guarded against by use of available discovery procedures may not

---

**7.** Dubois, whose main attack throughout his discussion of the damage question is that loss of value rather than repair cost should apply, specifically argues that even insofar as repair cost might be germane, the Aults actually focused on *replacement* cost rather than *repair* cost. Our review suggests that much of the replacement cost evidence was indistinguishable from evidence of repair cost. For example, a shattered window or a broken pipe is repaired by being replaced. Replacement cost was clearly proper as to the dead trees, since the only way to effect restoration of *dead* trees is to plant new ones.

It is in the context of the damaged or destroyed items of personal property where evidence of replacement cost seems least appropriate, especially since many of the items were old, worn, or otherwise marginal to begin with, and the date of damage or destruction was unknown. On the other hand, the jury appears to have done a disciplined job of evaluating that evidence. It awarded some $16,000 less than the Aults' evidence which, if accepted uncritically, would establish as a total for all damages.

**8.** Even if Dubois had more responsibly terminated his tenancy, it is not clear this case would have turned out much differently. There was abundant testimony from which the jury could conclude that most of the damage to the property had been committed over the course of Dubois' 10–year occupancy rather than in the three or four day period following his abandonment.

serve as a ground for a new trial. *Anderson v. Bradley*, 590 P.2d 339, 341–42 (Utah 1979). The trial court did not abuse its discretion in refusing to grant a new trial based on surprise. Under the same general principal articulated in *Anderson*, we decline to require reduction of the judgment to $25,000.

## TREBLE DAMAGES

■ The Aults argue that they should be awarded treble damages for waste to real property pursuant to Utah Code Ann. § 78-38-2 (1987). That statute reads:

> If a guardian, tenant for life or years, joint tenant or tenant in common, of real property commits waste thereon, any person aggrieved by the waste may bring an action against him therefor, in which action there may be a judgment for treble damages.

The statute by its own terms does not include tenants at will or tenants for periods of less than a year. Even if we accepted the Aults' argument that periodic tenancies for lesser periods are now treated almost identically to tenancies for terms of a year or more, and we included Dubois within the scope of the statute,[9] the language is permissive rather than mandatory. Based on the record, we find no abuse of discretion in the trial court's denying the Aults' request for treble damages.[10]

The judgment is accordingly affirmed. Costs of the appeal to Aults and of the cross-appeal to Dubois.

JACKSON and BENCH, JJ., concur.

---

**9.** Cases relied on by the Aults in support of this argument actually involve states having statutes which expressly allow treble damages for waste committed by tenants for periods of less than a year. *See, e.g., Cruickshanks v. Eak*, 33 N.J.Super. 285, 110 A.2d 61, 62 (1954); *Dorsey v. Speelman*, 1 Wash.App. 81, 459 P.2d 416, 417 (1969).

**10.** The jury specifically found that an award of punitive damages was inappropriate in this case, which bolsters the propriety of the trial court's decision not to award treble damages. Both judge and jury apparently concluded that Dubois, while inept in his care of the property and control of the boys, had not acted with sufficient culpability to warrant more than an award of actual damages. At the back of their minds may well have been some trepidation about how loud the Aults should be heard to complain in view of their curious decision to entrust an historic landmark to a group of wayward and delinquent boys.