Harry THORSEN, Plaintiff and Appellant,

v.

Markay JOHNSON, and Bryce Johnson, individually, and Markay Johnson and Bryce Johnson, dba Gooseberry Estates, a partnership, Defendants and Respondents.

GOOSEBERRY ESTATES, a partnership consisting of Tokaco Enterprises (itself a family partnership consisting of William T. Gardner and his children William Todd Gardner, Kari Ann Gardner, and Corrina Ann Gardner), Latigo, Inc., a corporation; Tell W. Gardner; Bryce Johnson; Markay Johnson and Leonard V. Elfervig, all dba Gooseberry Estates, a Utah Partnership, Plaintiffs and Respondents,

v.

Harry THORSEN and Donald Gates, Defendants and Appellants.

No. 18960.

Supreme Court of Utah.

Nov. 5, 1987.

Norman H. Jackson, Richfield, for appellants.

Ken Chamberlain, Richfield, for respondents.

HOWE, Justice:

This is an appeal from a judgment in favor of Gooseberry Estates, a partnership, against Harry Thorsen and Donald Gates (hereinafter Thorsen) for damages to a proposed real estate development in Sevier County caused when Thorsen dredged an inactive irrigation ditch which coursed through the development.

██ Thorsen was a downstream user of the irrigation water and contended that he had the right to enter upon Gooseberry's property for the lawful purpose of cleaning the ditch. Gooseberry contended that the ditch had long been abandoned, that another ditch had been established in another location to carry Thorsen's water, and that he did the dredging for the sole purpose of preventing the use of Gooseberry's land for a planned subdivision to which he, as a nearby landowner, was opposed. The case was tried before the court without a jury, and the trial judge made a personal inspection of the property. In entering judgment in favor of Gooseberry, the trial court made findings of fact which are not clear as to whether the court found that the ditch had been abandoned prior to the dredging. However, at the oral argument of this case before this Court, counsel for Gooseberry admitted that the trial court did not find an abandonment and that Thorsen had an easement through Gooseberry's land for the ditch.

Nevertheless, in other findings of fact, the court found that the dredging by Thorsen greatly exceeded the mere cleaning of the ditch and amounted to a substantial widening and deepening of the ditch whereby a large number of trees were uprooted and an excessive amount of earth and rocks were excavated. Specifically, the court found that the ditch "should not have been cleaned or dug up in the manner that it was and if there had been any right at all it would have been merely the right of running a plow through the area, the right merely to handclean the ditch and it would have delivered more water under the circumstances than it will at the present time." The evidence fully supports the findings of fact and conclusions of the court that Thorsen exceeded and abused his right to enter upon Gooseberry's land to clean the ditch and that he is liable for damages.

██ Thorsen further contends that the damages found against him were excessive and based upon an erroneous measure. Although there are exceptions and variations,[1] generally the measure of damages

---

1. Another measure of damages, discussed in the dissent, is the cost of restoring the damaged trees. In *Pehrson v. Saderup*, 28 Utah 2d 77, 498 P.2d 648 (1972), we refused to employ that measure of damages where lilacs growing around a rental unit were destroyed. We held

for injury to real property is the difference between the value of the property immediately before and immediately after the injury (often referred to as the "Diminution in Value" rule). *Pehrson v. Saderup*, 28 Utah 2d 77, 498 P.2d 648 (1972); *Brereton v. Dixon*, 20 Utah 2d 64, 433 P.2d 3 (1967); 22 Am.Jur.2d *Damages* § 132. The trial court apparently endeavored to apply this measure of damages when it announced:

> The court finds that there were nine lots which were totally destroyed, and the court sets the value of $6,000 per lot and in its present condition and not being improved based upon the work up to that time; the plaintiffs are awarded a judgment of $54,000. That's based upon $6,000 per lot for the nine lots.

This analysis is flawed in two respects. There was no evidence that the "lots" had a fair market value of $6,000 before Thorsen enlarged the ditch, and there was no evidence that the ditch *totally destroyed* nine "lots." The following factual background is helpful to an understanding of why the trial court erred.

On May 14, 1979, Gooseberry entered into a contract with Bryce Johnson to purchase from him 94.47 acres of land for a total of $66,750 or $706.57 per acre. Johnson had acquired the 94.47 acres on July 30, 1978, for the same price. Gooseberry contemplated subdividing 50.59 acres of that tract into a development of thirty-three lots, containing 1.53 acres per lot.

During the seventeen months which elapsed from May 14, 1979, when Gooseberry purchased the land, to October of 1980, when Thorsen damaged the land, no improvements were placed upon the property by Gooseberry. A preliminary subdivision plat was prepared, but a final plat had not been approved or recorded. Gooseberry expended $8,400 for surveying, mapping, and platting. It also expended $7,100 in an attempt to drill a well to provide culinary water for the lots. Adequate water was not found. At the time of trial,

Gooseberry still owed $16,000 on the purchase of the property. Gooseberry put on testimony that the projected cost of the improvements was $171,125, but this did not include a central sewage system which the county later required.

The $6,000–per–lot damage found by the lower court was apparently based on testimony given by an appraiser, Kenneth Esplin, that if and when the subdivision was approved and recorded, water was made available, and the improvements were in place, the lots should sell for $12,000 each. He opined that ten of the proposed lots were damaged so as to reduce their potential value by 50 percent, or to $6,000 each. Esplin admitted that he was not very familiar with the market for mountain lots in Sevier County where the property was located. He based his opinion on sales made in the Cedar City and Fairview areas in other counties. Counsel for Thorsen repeatedly objected to Esplin's testimony on the grounds that it was speculative, conjectural, and irrelevant.

The difficulty with Esplin's testimony, and the court's judgment which was based upon it, is that at the time Thorsen inflicted damage upon the realty, the property was in a pristine state exactly the same as when it had been purchased seventeen months earlier. It is true that Gooseberry had expended $15,500 *in preparations* to improve it with the expectation that some day it would become a subdivision of mountain lots. However, before this expectation could be realized, Gooseberry would have to finish paying for the land, develop a culinary water supply approved by the health department, and install a central sewage system. Then, county planning and zoning approval of the final plat, together with approval by the County Commission, would have to be granted. Thereafter, financing for hundreds of thousands of dollars worth of improvements would have to be obtained. When the improve-

---

that it would be unreasonable to there employ that measure, but recognized that it might be reasonable in a case where an ornamental tree was damaged on a residential lot. In the instant case, costs of restoration would be unrea-

sonable since the value of an acre of similar land would be $1,250 and restoration costs would exceed $100,000 on the 1.08 acres which Thorsen damages.

ments were in place, buyers who were ready and willing to pay $12,000 for each of the thirty-three lots would have to be found.

In viewing Gooseberry's land as a completed subdivision, Esplin and the trial court lost sight of the fact that the measure of damages is the diminution of the fair market value of the property immediately following the infliction of the damage—not what the property may be worth when and if substantial sums of money are expended to turn it into an improved subdivision. In *State v. Tedesco*, 4 Utah 2d 248, 291 P.2d 1028 (1956), a condemnation case in which the jury was instructed to find the fair market value of the property, we quoted with approval from *Pennsylvania S.V. R. Co. v. Cleary*, 125 Pa. 442, 17 A. 468 (1889).

> It is proper to inquire what the tract is worth, having in view the purposes for which it is best adapted, but it is the tract, and not the lots into which it might be divided, that is to be valued.... The jury are to value the tract of land and that only. They are not to determine how it could best be divided into building lots, nor conjecture how fast they could be sold, nor at what price per lot. A speculator or investor, in deciding what price he could afford to pay, would consider the chances and probabilities of the situation as then actually existing. A jury should do the same thing. They are not to inquire what a speculator might be able to realize out of a resale in the future, but what a present purchaser would be willing to pay for it in the condition it is now in.

More recently, the Supreme Court of Colorado in *Department of Highways v. Schulhoff*, 167 Colo. 72, 445 P.2d 402, 405 (1968), quoted the above passage from *Pennsylvania S.V.R. Co. v. Cleary* and restated the same rule as follows:

> It is proper to show that a particular tract of land is suitable and available for subdivision into lots and is valuable for that purpose. It is not proper, however, to show the number and value of lots as separated parcels in an imaginary subdivision thereof. Stated differently, it is

improper for the jury to consider an undeveloped tract of land as though a subdivision thereon is an accomplished fact. Such undeveloped property may not be valued on a per lot basis, the cost factor clearly being too speculative.

By fixing the damages based on a completed, improved subdivision, the trial court valued the land before it was damaged at $3,921 per acre, whereas it had been purchased seventeen months earlier at $706.57 per acre. This amounts to a 450 percent increase in value—without a single improvement to the realty. Significantly, appraiser Esplin testified that the remaining 43.88 acres of the 94.47 acres purchased by Gooseberry (which were not going to be subdivided) had a fair market value of $1,250 per acre. This was exactly the same value per acre ascribed to the entire 94.47–acre tract by Thorsen's appraiser, Joseph S. Stott. Stott belonged to a firm which had been marketing real estate in Sevier County for seven years. Mountain subdivision lots had been advertised for sale and listed with his agency. However, he testified, "in the years that I have been in the business, we have yet to sell a mountain lot out of our office."

Esplin's appraisal was also flawed because it was based on his assumption that no one had a lawful irrigation ditch easement through the "lots." This was erroneous. As previously mentioned, at oral argument of this case before this Court, counsel for Gooseberry Estates admitted that the trial court did not find an abandonment and that Thorsen had an easement for the irrigation ditch.

Additionally, while Esplin testified that the ditch as enlarged by Thorsen would reduce the potential value of any improved lot from $12,000 to $6,000, he did not testify that the value of any of the proposed lots was totally destroyed by the enlarged ditch. To the contrary, he testified the ditch diminished their potential value by 50 percent. Thus, there is no basis in the evidence for the trial court's conclusion that the value of the nine lots was totally destroyed. The ditch, as widened and deepened by Thorsen, was fifteen feet wide.

The remainder of the proposed 1.53–acre lots through which the ditch coursed was undamaged[2] and could be used at a minimum for grazing purposes. The entire ditch occupied 1.08 acres (3,150 ft. long × 15 ft. wide). This would be the maximum land which could have been "totally destroyed." It too assumes, contrary to the admission of Gooseberry's counsel, that Thorsen had no right at all to an easement.

Since the amount of damages found by the trial court was arrived at by an erroneous method, we reverse the judgment and remand the case to the trial court for reassessment of damages.

HALL, C.J., and STEWART, Associate C.J., concur.

ZIMMERMAN, Justice (concurring in the result):

I agree with Justice Durham's statement of the law of damages. However, I agree with the majority that the trial court made several unjustified assumptions in fixing the amount of damages. Therefore, I join the majority in remanding the case for a reassessment of damages. In making that reassessment, I would hold that the trial court should be guided by the broader damage principles discussed in Justice Durham's opinion.

DURHAM, Justice (concurring and dissenting):

I join the majority opinion in affirming the judgment as to liability, but dissent from its treatment of the damage question. The measure of damages for permanent injury to land and damage to trees was recently treated by the Utah Court of Appeals in *Ault v. Dubois*, 739 P.2d 1117 (Utah Ct.App.1987):

> Generally, the measure of damages for permanent injury to land is the difference in the market value of the land immediately before and immediately after the injury, but if the land may be restored to its original condition, the cost of restoration may be used as the mea-

sure of damages if it does not exceed the diminution in the market value.

*Id.* at 1120 (citations omitted). The opinion correctly notes that the above standard is not a rigid one and that "even when diminution in value is clearly the appropriate measure of damages, evidence as to repair costs is admissible for the purpose of helping [the fact finder] determine the loss of value." *Id.* at 1121 (citations omitted).

In *Brereton v. Dixon*, 20 Utah 2d 64, 433 P.2d 3 (1967), this Court endorsed a flexible rule particularly applicable for damages to land associated with destruction of trees on the realty.

> When property has been damaged or destroyed by a wrongful act, the desired objective is to ascertain as accurately as possible the amount of money that will fairly and adequately compensate the owner for his loss.
>
> . . . .
>
> Because of the fact that any attempt at unvarying uniformity in applying either [the diminution in value rule or the separate value rule], a third rule, which we believe to be the better considered and more practical one, has been applied. It gives the injured party the benefit of whichever of the two rules will best serve the objective hereinabove stated of giving him reasonable and adequate compensation for his actual loss as related to his use of his property.... If he wants to maintain a fruit orchard, a wood lot, or even a primitive area, though his property may be more valuable if turned to an industrial or residential purpose, that should be his prerogative; and if it is wrongfully destroyed or damaged, the wrongdoer should pay for the actual damage he caused.

*Id.* at 66, 67–68, 433 P.2d at 5–6.

A few years later, in *Pehrson v. Saderup*, 28 Utah 2d 77, 498 P.2d 648 (1972), this Court quoted with approval the following language from *Thatcher v. Lane Construction Co.*, 21 Ohio App.2d 41, 254 N.E. 2d 703 (1970):

---

**2.** We recognize that the ditch, as enlarged, might possibly impair access to parts of the proposed lots, but there was no evidence adduced on this subject.

Where the presence of trees is essential to the planned use of property for a homesite in accordance with the taste and wishes of its owner, where not unreasonable and where such trees are destroyed by trespassers, the owner may be awarded as damages the fair cost of restoring his land to a reasonable approximation of its former condition, if such restoration be practical, without necessary limitation to diminution in market value of such land.

28 Utah 2d at 79, 498 P.2d at 650 (citing *Thatcher*, 21 Ohio App.2d at 49, 254 N.E.2d at 708). The *Pehrson* opinion goes on to state what I believe to be a sound and just rule: "In a determination of the appropriate measure of damages in this area, the cardinal principles are flexibility of approach and full compensation to the owner, within the overall limitation of reasonableness." *Pehrson*, 28 Utah 2d at 79, 498 P.2d at 650.

The trial court in this case found as fact that defendant Thorsen "willfully and intentionally ... [made] a massive, senseless, purposeless ditch across [plaintiffs'] premises." A review of the numerous photographs in the record explains the finding that the trial judge, after personal inspection of the land, was "shocked at the damage which was done to the premises ... and [had] grave doubts whether or not the property ... can ever be used for the purposes for which they [sic] were bought by the Plaintiffs." The evidence showed that more than two hundred mature pine trees and one hundred and seventy cedars over eight feet tall were uprooted by defendant. Plaintiffs' experts testified that replacing them would cost approximately $275 per tree and that the trees on the lots were extremely important to the development and sale of the lots. Other testimony established that many lots would not even be saleable without grading and reseeding at a cost of $80,000 *without* replacing any trees. In short, although disputed, there was considerable evidence upon which the trial court could rely in awarding $54,000. In view of the malice that motivated this destruction, I am not in the least troubled by the flexible approach the trial judge

took in applying the diminution in value rule. In fact, I think he would have been justified in using the restoration costs, within some reasonable limit, as a measure of damages. Fifty-four thousand dollars, as compared to the cost of replacing the destroyed trees (more than $100,000) seems very reasonable to me. The majority's approach is, I believe, contrary to our case law supporting the principle of full compensation within the overall limitation of reasonableness.

Finally, I note that Utah Code Ann. § 78-38-3 (1987), upon which plaintiffs apparently did not rely, provides for the trebling of civil damages against "any person who cuts down ... or otherwise injures any tree ... on the land of another person ... without lawful authority."