*This opinion is subject to revision before final publication in the Pacific Reporter.*

**2015 UT 89**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STEPHEN A. OSGUTHORPE, individually and in his capacity as Interim Personal Representative of the Estate of D.A. Osguthorpe, D.V.S. and also in his capacity as Successor Trustee of The Dr. D.A. Osguthorpe Trust; and D.A. Osguthorpe Family Partnership,
*Appellants,*

*v.*

ASC UTAH, INC.; AMERICAN SKIING COMPANY; LESLIE B. OTTEN; WOLF MOUNTAIN RESORTS, L.C.; et al.
*Appellees.*

No. 20130861
Filed October 13, 2015

Third District, Summit County
The Honorable Bruce C. Lubeck
No. 060500297

Attorneys:

David W. Scofield, Larry R. Williams, Sandy, for appellants

John R. Lund, Julianne P. Blanch, Salt Lake City, Joseph E. Wrona, Park City, for appellees

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, JUSTICE DURHAM, and JUDGE ORME joined.

Having recused himself, JUSTICE HIMONAS does not participate herein; COURT OF APPEALS JUDGE GREGORY K. ORME sat.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1   This appeal arises out of a longstanding dispute between the Stephen A. Osguthorpe family and ASC Utah, Inc. The Osguthorpes own land that has long been used for sheep ranching. For many years ASC operated The Canyons ski resort on land adjacent to that owned by the Osguthorpes. By contract the Osguthorpes authorized ASC to use their land in exchange for an annual payment. That contract has been amended by the parties a number of times. It also implicates the interests of a third party—the estate of Enoch Smith—which has been deemed entitled to 50 percent of any rents derived from the Osguthorpe land.

¶2   The Osguthorpes have asserted that ASC stands in breach of contract. Their claims arise out of ASC's management of the land in question. In challenging ASC's actions, the Osguthorpes asserted claims for breach of the covenant of good faith and fair dealing, for injunctive relief, and for equitable rescission or reformation of the agreement between ASC and the Osguthorpes. The first claim was resolved against the Osguthorpes in a jury trial. The second and third claims were decided by the district court in a bench trial—in a decision denying injunctive relief and refusing to terminate the agreement but agreeing to reform it in part.

¶3   We affirm in large part. First, we affirm the Osguthorpes' challenge to matters resolved in the course of the jury trial on the ground that we lack jurisdiction (given the Osguthorpes' failure to file a notice of appeal as to the jury verdict). Second, we affirm the trial court's refusal to award injunctive relief because we deem the court's decision a matter falling within its equitable discretion, and we see no abuse of that discretion. And third, we affirm the decision to reform the contract prospectively in part; we vacate only the portion of the trial court's order purporting to dispose of the rights of the Osguthorpes (and the Smith estate) to payments tendered by ASC but rejected by the Osguthorpes.

I

¶4   In 1996, D.A. Osguthorpe and the Osguthorpe Family Partnership entered into a twenty-eight-year agreement with Wolf Mountain ski resort. That agreement granted Wolf Mountain the right to use some of the land the Osguthorpes used for sheep herding. This simple, single-page document provided that Wolf Mountain would pay the Osguthorpes "annual rental payments for the Property in the amount of $100,000." That amount was to

be paid in advance at the beginning of each year. A short time later, Wolf Mountain assigned its rights under the agreement to ASC, who has owned and operated The Canyons ski resort on the land for many years.

¶5    ASC and the Osguthorpes amended the agreement twice, with two effects. The first was to eventually bring the total payment to $200,000 annually. And the second was to add some references to services (like consulting) that the Osguthorpes were to provide under the agreement.

¶6    Shortly after the second amendment, the estate of Enoch Smith—a business partner of D.A. Osguthorpe—sued the Osguthorpes, seeking a share of the annual payments under a pre-existing partnership dissolution agreement. *Smith v. Osguthorpe*, 2002 UT App 361, ¶¶ 6, 8–9, 58 P.3d 854. The Osguthorpes' defense was that the partnership dissolution agreement entitled Smith's estate only to "lease" payments, and that the amended agreements between the Osguthorpes and ASC actually conveyed an *easement* (meaning there was no "rent") and were intended to be largely a contract for personal services. *Id.* ¶¶ 36–38, 42–44.

¶7    In the Osguthorpe-Smith case, the district court asked ASC—a nonparty—to "set forth its position" with respect to the meaning of the amended agreements. ASC declined, citing its non-party status. And the district court wound up ruling in favor of Smith's estate, holding that it was entitled to half of the annual payments and that the agreements in fact did not represent a contract for services. Our court of appeals upheld this interpretation of the amended lease agreement, though it remanded on the issue of whether the agreements were "integrated" with respect to the question of dividing the payment between rents and personal services. *Id.* ¶¶ 45–46.

¶8    While this litigation was pending, ASC and the Osguthorpes executed a "Restatement of Agreement" on August 1, 2001. The Restatement of Agreement attempted to establish a process to allocate the annual payment between the fair market value of ASC's rights in the land and the services to be provided by the Osguthorpes. The process chosen in the Restatement of Agreement—valuation of the interest in the land by several appraisers—pegged the value of ASC's use of the land at a mere $3,275.50 annually. Thus, the balance of the $200,000 payment was to be for the *services* the Osguthorpes would render. The obvious effect would have been to greatly diminish the value of the Smith estate's interest under the partnership dissolution agreement.

¶9    These efforts notwithstanding, the district court in the Osguthorpe-Smith case concluded that the Restatement of Agreement had legally failed to accomplish this objective. *Smith v. Osguthorpe*, 2006 UT App 425 (per curiam) (unpublished opinion). Thus, the court held that despite the allocation of the payment between rent and services, it was "not a new agreement" at all. Instead, "as evidenced by the caption," it was a "'*Restatement* of Agreement.'" The court also found "critical" the fact that the Restatement of Agreement's effective date was retroactive to August 1996—the signing date of the original agreement between the Osguthorpes and Wolf Mountain. Because it had already "held that the contractual relationship between the Osguthorpes and [ASC] [based on the 1996 agreement] concern[ed] solely the lease of the land and include[d] no compensation for services rendered by the Osguthorpes to [ASC]," the district court held that Smith's estate was *still* entitled to half of the *entire* annual payment, and not just the $1,600 or so it would receive under the Osguthorpes' reading of the Restatement of Agreement.

¶10    The court of appeals held that the Osguthorpes had failed to file a timely appeal from the decision regarding the validity of the Restatement. *Id.*  And in the Osguthorpe-ASC suit, the district court held that this determination of the effect of the Restatement of Agreement was binding as a matter of res judicata.

¶11    As the above litigation proceeded, the relationship between the Osguthorpes and ASC began to deteriorate. Over the course of several years, the Osguthorpes complained of a range of breaches by ASC—allegedly placing snow-making pipes above ground in a manner injuring the Osguthorpes' sheep, mowing areas intended for sheep grazing, permitting soil erosion in various places, and failing to prevent invasive weed species from taking root. In the Osguthorpes' view, ASC perpetually failed to heed the Osguthorpes' requests or to respond to their complaints. Around 2006, the Osguthorpes tried to get ASC to execute "two completely separate agreements" to make clear that the parties had all along (since 1996) intended for an allocation of the annual payment between rent and personal services, seemingly in yet another attempt to resolve the dispute with the Smith estate. But ASC refused to do so. And this was apparently a tipping point in the parties' relationship.

¶12 From 1997 to 2006, ASC had tendered (and the Osguthorpes had accepted) all required payments under the agreements—a total of $2,000,000. But after ASC's refusal to sign the

new proposed agreements in 2006, the Osguthorpes refused to accept any tendered payments, though ASC continued to nominally tender them until at least 2010. The Osguthorpes took the position that ASC's alleged breaches in failing to properly take care of the land had terminated any agreement between the two parties. And they filed the suit that is before us on this appeal.

¶13  The Osguthorpes asserted several claims, including one for breach of the covenant of good faith and fair dealing and a claim for equitable rescission or reformation of the agreement between ASC and the Osguthorpes. The good faith and fair dealing claim complained of two of ASC's decisions. First was the decision not to intervene in the Smith litigation when the district court asked ASC to "set forth its position" regarding whether the original agreements in fact intended to divide the payment between rent and services. The second decision was ASC's refusal to sign new separate agreements in 2006 that would similarly help the Osguthorpes with the Smith lawsuit.

¶14  The rescission and reformation theories of relief were premised on an allegation of mutual mistake (as to the legal effect of the language chosen in the 2001 Restatement of Agreement) as well as allegations of continuing breaches of contract and damages that were difficult to estimate (injuries to sheep, top soil, grazing areas, etc.). Initially, the Osguthorpes brought these allegations to bear in a claim for waste, seeking damages. But they eventually abandoned that theory of recovery, and instead sought only to rescind or reform the contract based on these alleged injuries. The Osguthorpes claimed that such injunctive relief was proper because they lacked an adequate remedy in damages. The Osguthorpes argued that their land had been extensively damaged beyond what they had anticipated, and that monetary relief was not sufficient to remedy the damage.

¶15  The Osguthorpes' lawsuit was consolidated with an ongoing suit between ASC and Wolf Mountain. At some point prior to the trial on claims involving the Osguthorpes and ASC, ASC filed a motion for partial summary judgment. With respect to the request for reformation, the court held that material issues of fact precluded summary judgment. The court also stated in its written order that the Osguthorpes were not entitled to a jury trial on this matter and that "[t]he *Court* will hear evidence and decide if an equitable reformation remedy should be afforded." Elaborating on this point, the order stated that absent a stipulation by the parties "to submit factual findings to the jury on these issues," or an

argument by someone that there were common "operative facts" affecting "both legal and equitable" issues in the case, these issues would be decided "by the Court" and not a jury.

¶16 For economy's sake, the trial court allowed evidence on all the claims between all the parties to be presented in the presence of the jury. Yet the court also made clear which claims would be resolved by the court and which would be submitted to the jury. It did so through a series of rulings approving or rejecting proposed jury instructions.

¶17 The Osguthorpes submitted jury instructions and a special verdict form instructing the jury on reformation of a contract in the event of mutual mistake, termination of a contract, and a lengthy instruction on the Osguthorpes' views of the law of good faith and fair dealing. The trial judge expressly rejected the Osguthorpes' proposed instruction on good faith and fair dealing as unsupported by Utah law. There was no such *express* ruling pertaining to the instructions on reformation and termination. But the court *functionally* rejected them when it excluded them from its final approved jury instructions sent to the parties on April 25, 2011. Thus, only the Osguthorpes' claim for breach of the covenant of good faith and fair dealing was submitted to the jury.

¶18 The next day, the jury rendered a verdict in favor of ASC, finding no breach. This was not a final order, however, since the case involved multiple claims and multiple parties, and the verdict did not dispose of all the claims as against all the parties. *See* UTAH R. CIV. P. 54(b).

¶19 Over the next few weeks, the court held a series of hearings with respect to the Osguthorpes' requests for equitable remedies. As those hearings unfolded, the court certified the jury verdict as final under rule 54(b) of the Utah Rules of Civil Procedure—in an order entered on July 26, 2011. Three days later, the district court issued a non-final order ruling on the issues of termination and equitable reformation, and on the Osguthorpes' request for injunctive relief.

¶20 The court denied injunctive relief, holding that the injuries complained of could have been adequately compensated through money damages, an avenue of relief the Osguthorpes had previously abandoned. It also held that rescission was unavailable in light of the parties' mutual intent to enter into the Restatement of Agreement. Yet the court also equitably reformed the Restatement of Agreement. It did so based on several findings of fact: (1) payments were tendered each year from 2006 to 2010 by ASC but the

Osguthorpes rejected the payments each year; (2) during those years the Osguthorpes rendered no services to ASC; (3) the Osguthorpes failed to perform any services because they considered the contract terminated from 2006 onward on account of the alleged breaches; and (4) prior to 2006 all fees were paid by ASC and the Osguthorpes had earned those fees. It then held there had been a mutual mistake as to the legal effect of the Restatement of Agreement—the parties had in fact intended for there to be a division in the payment between services and rental fees all along. And because of this mutual mistake, the court held that reformation was in order.

¶21 In crafting the reformation, however, the court held that complete "retroactive reformation would work injustice on both ASC and The Estate of Enoch Smith," because prior to 2006 the Smith estate had a valid legal claim to half of the entire annual payment ($100,000 per year), and from 2006 to 2010 the Osguthorpes had never performed any services. The court then commented that the Osguthorpes had no claim to the money tendered by ASC and refused by the Osguthorpes, and that the Smith estate had "no claim against either [the] Osguthorpes or ASC for a share of annual payments from 2006 to 2011 inclusive." It thus reformed the Restatement of Agreement, but held that the parties' intent would be given effect only from August 2011 onward.

¶22 This order was not final, however, as it directed the Osguthorpes to prepare a judgment that complied with the court's ruling. The final order issued in December of 2011. The Osguthorpes then filed a motion under Utah Rules of Civil Procedure 52 and 59, tolling the time period in which to file a notice of appeal. These motions were ultimately denied in a final order on August 9, 2013. It is from that order that the Osguthorpes now appeal.

II

¶23 The Osguthorpes allege four sets of errors in this appeal. First, they claim that their constitutional right to a jury trial was infringed when the district court declined to submit issues relating to termination and reformation of the Restatement of Agreement to the jury. Second, they challenge the district court's rejection of a proposed jury instruction relating to the covenant of good faith and fair dealing. Third, they take issue with the trial court's refusal to enjoin ASC from misusing their land, and with the factual findings entered in support of that refusal. Finally, they challenge the decision to reform the Restatement of Agree-

ment prospectively while also holding that neither the Osguthorpes nor the Smith's estate have any claim to the annual payments ASC tendered from 2006 to 2011 (which the Osguthorpes rejected).[1]

¶24 We affirm the trial court's decision in most respects. We reject the first two claims of error on jurisdictional grounds—concluding that the district court's decisions on the claimed right to a jury trial and on the requested jury instruction merged with the jury verdict, and noting that the Osguthorpes failed to file a notice of appeal within thirty days of the date when that verdict was certified as final under rule 54(b). On the third claim (regarding the denial of injunctive relief), we find no abuse of discretion in the determination that the Osguthorpes had an adequate remedy at law and no clear error in the factual findings supporting that decision. Finally, we also affirm the decision to reform the Restatement of Agreement prospectively, upholding the district court's authority to fashion equitable relief in a manner protecting the rights of third parties.

¶25 We reverse on one minor point, however. We conclude that the district court exceeded its discretion in holding that neither the Smith estate nor the Osguthorpes were entitled to the tendered but rejected payments made from 2006 to 2011. Thus, we vacate the portion of the district court's order holding that neither the Smith estate nor the Osguthorpes had any claim to the tendered but rejected payments, as those issues were not properly presented to the district court for decision.

A

¶26 The first two claims of error alleged by the Osguthorpes trace back to the jury trial. In asserting their right to a jury trial on their claim for reformation and termination of the Restatement of Agreement, the Osguthorpes are effectively challenging the district court's refusal to give a jury instruction on that claim. And the second contention on appeal is squarely directed at a decision made in the course of the jury trial—in refusing to give an instruction on the covenant of good faith and fair dealing.

¶27 We lack jurisdiction to consider these claims. The jury verdict was certified as a final judgment under Utah Rule of Civil Procedure 54(b) on July 26, 2011. On that date the district court

---

[1] The Osguthorpes do not appeal the trial court's decision not to rescind the contract.

entered an order certifying as "final and appealable" the "jury verdict and Judgment on both *the Osguthorpe claims*, and all claims between ASC Utah and Wolf Mountain *that were tried to the jury*." (Emphasis added). The only "Osguthorpe claims" that were "tried to the jury" were the claims for breach of the covenant of good faith and fair dealing. The judgment on the jury verdict, however, also encompassed the decisions made by the district court on jury instructions requested in the course of the jury trial.

¶28 Under the doctrine of merger of judgments, the final judgment on the jury verdict also rendered final and appealable all interlocutory decisions that led up to that judgment.[2] Those interlocutory decisions, moreover, clearly encompassed the decisions denying requested jury instructions on the claim for reformation and termination of the Restatement of Agreement and on the claim for breach of the covenant of good faith and fair dealing. The district court's refusal to give the requested instructions accordingly became final and appealable on July 26, 2011. As we have emphasized, the signing and filing of a final judgment "starts the appeal clock running." *Perez v. S. Jordan City*, 2013 UT 1, ¶ 12, 296 P.3d 715 ("Because missteps in timing can deprive an appellate court of jurisdiction, the law takes care to define the event triggering the appeal period with certainty."). It therefore was incumbent on the Osguthorpes to file a notice of appeal within thirty days of that date if it wished to preserve its appeal on these issues. *See* UTAH R. APP. P. 4(a).

¶29 The Osguthorpes failed to do so. They waited until after final judgment on the equitable claims tried to the bench to file

---

[2] *See* 15A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRACTICE & PROCEDURE § 3905.1 n.22 (2d ed. Supp. 2015) (noting that in the context of a rule 54(b) certification, the merger rule "opens up the record as to the parties involved in the appeal in the same way as an appeal from a final judgment that disposes of the entire action"). *See also Butler v. Corp. of President of Church of Jesus Christ of Latter-day Saints*, 2014 UT 41, ¶ 49, 337 P.3d 280 (Lee J., dissenting) (emphasizing that the doctrine of merger of judgments "is an important doctrine of judicial economy and convenience" that establishes "an administrative principle of merger—that interlocutory decisions merge into final, appealable ones").

their notice of appeal—on September 4, 2013.[3] That notice was untimely as to the jury instructions that were requested in the course of the jury trial, however. And the failure to file a timely notice deprives this court of jurisdiction. *See McGibbon v. Farmers Ins. Exch.*, 2015 UT 3, ¶ 14, 345 P.3d 550.

¶30 The Osguthorpes' notice of appeal challenges the ruling and order "entered on August 9, 2013" by the district court. But that order made final the district court's decisions as to the Osguthorpes' equitable claims that were tried to the bench. The court's refusal to give jury instructions was a decision rendered in the course of the jury trial, and merged into the July 26, 2011, certification order. Thus, the Osguthorpes' notice of appeal preserved only their right to challenge the decisions made by the district court on the claims before it in the bench trial. The attempted challenge to the refusal to issue jury instructions is foreclosed by their failure to file a separate notice of appeal within thirty days of the certification order entered on July 26, 2011.

¶31 The Osguthorpes' principal challenge to this conclusion is to point to a different order entered by the district court. They claim that the decision not to submit the reformation and termination claims to the jury was not made until after the certification order. Specifically, the Osguthorpes direct our attention to an order entered on July 29, 2011, entering findings and conclusions regarding the Osguthorpes' equitable claims. They note that in the July 29 order the court indicated that "[a]t various times both before and during trial" the court and counsel discussed the matter of which claims would go to the jury and which would not, while also stating that the court did "not recall the Osguthorpes' counsel ever identifying legal and factual issues that shared the same operative facts, such that they should be decided by binding jury verdict." And they insist that their appeal on these first two issues was from this order, and not the one certified on July 26, 2011. Because the July 29, 2011, order was not rendered final until much later (August 9, 2013), moreover, the Osguthorpes insist that their appeal on these issues was timely.

---

[3] Final judgment was entered on the equitable claims on December 14, 2011; a post-judgment motion under Rules 52 and 59 was timely filed on December 29, 2011, staying the time for filing an appeal on the equitable claims until the judge denied the motion to amend on August 9, 2013.

¶32 We disagree. The order entered on July 29, 2011, merely reflects, and does not itself effectuate, the decision as to which claims would be submitted to the jury. As noted above, the decision itself was made in the course of trial—in the refusal to issue the jury instructions the Osguthorpes requested. And the terms of the July 29 order are merely reflective. The order says the court "*stands by* its reservation"(emphasis added)—a reservation made in the course of the jury trial, in the denial of the Osguthorpes' requested jury instructions. So the July 29 order, when read in context, clarifies that the decision in question was made in the course of the jury trial, and certified as final on July 26, 2011.

¶33 We accordingly dismiss the Osguthorpes' appeal to the extent it seeks to challenge decisions made in the course of the jury trial. Such decisions merged into the order that was certified as final on July 26, 2011, and we lack jurisdiction due to the Osguthorpes' failure to file a timely notice of appeal from that order.

B

¶34 The Osguthorpes' next claim of error is aimed at the district court's denial of their requested injunctive relief. That decision encompasses a threshold legal decision, intermediate factual findings, and, ultimately, a mixed determination (applying the governing law to the facts).

¶35 The threshold legal standard is undisputed: Injunctive relief is available only upon a showing of irreparable harm, or in other words harm that cannot adequately be compensated through money damages.[4] Before applying that standard, the district court entered a series of factual findings—asserting that the Osguthorpes' land "ha[d] indeed been damaged" as a result of the "unnecessary removal of trees and ground cover" by ASC and the "trash" and "noxious weeds" it had produced; that ASC failed "to consult" with the Osguthorpes about changes to the land as required under the Restatement of Agreement "on many occasions"; that "at least some livestock, including sheep, have been injured or killed"; and that "remediation" of these harms was "possible, albeit expensive." The trial court also applied the legal

---

[4] *See, e.g.*, *Strawberry Elec. Serv. Dist. v. Spanish Fork City*, 918 P.2d 870, 881 (Utah 1996) (noting that irreparable harm, or in other words the lack of an "adequate remedy at law," exists where "[m]onetary damages would be difficult and perhaps impossible to ascertain" (internal quotation marks omitted)).

standard to the facts of the case. In so doing, it rendered a mixed determination of law and fact, holding that the Osguthorpes' harms were not "irreparable," but could adequately be compensated through money damages, and thus that they were not entitled to injunctive relief.

¶36 The applicable standard of review is different for each category of decision. We yield no deference to abstract legal decisions (such as the standard for the availability of injunctive relief) and great deference to factual findings (here, as to the nature and extent of harm caused to the Osguthorpes' land by ASC). That much is settled—and straightforward. *See Manzanares v. Byington* (*In re Adoption of Baby B.*), 2012 UT 35, ¶¶ 40–41, 308 P.3d 382 (establishing de novo review for questions of law and clear error review for questions of fact). Our review of mixed determinations, however, is more complicated. We have said that our review of such decisions is sometimes deferential and sometimes not, depending on the nature of the issue. *Id.* ¶ 42.

¶37 As to decisions regarding the availability of equitable relief, our opinions betray some tension. In several cases we have applied a deferential "abuse of discretion" standard of review.[5] On at least one occasion, however, we stated that such a decision is "a legal conclusion that we review for correctness." *Ockey v. Lehmer*, 2008 UT 37, ¶ 42, 189 P.3d 51. The tension in our cases, however, is more apparent than real. It can be explained by the clarification noted above—that there are legal questions at the threshold of any analysis of the availability of equitable relief (as to the legal standard, for example, for judging the availability of injunctive relief), which may be stated in the abstract before they are applied to the facts of a particular case. On those abstract questions our review is de novo. In applying them, however, we review for abuse of discretion.[6]

---

[5] *See Mack v. Utah State Dep't of Commerce*, 2009 UT 47, ¶¶ 22, 24, 221 P.3d 194 (stating that "a grant of equitable relief" is reviewed "for an abuse of discretion," and holding that "the district court did not abuse its discretion in determining that legal remedies were inadequate"); *Thurston v. Box Elder County*, 892 P.2d 1034, 1042 (Utah 1995) ("[I]t was not an abuse of discretion for the trial court to deny equitable relief.").

[6] *See Manzanares v. Byington* (*In re Adoption of Baby B.*), 2012 UT 35, ¶ 42, 308 P.3d 382 (noting that we review mixed determina-

¶38 We apply that standard in our review of the district court's mixed determination that the Osguthorpes had not suffered irreparable harm sufficient to sustain their right to equitable relief. And we apply a deferential "clear error" standard in assessing its factual findings.

¶39 The factual findings are easily sustained under the applicable standard of review. There was ample evidence supporting the trial court's findings regarding the harm to the Osguthorpes' property and the remediability of the harm upon payment of monetary damages. Those findings, in fact, were sustained by the Osguthorpes' *own expert witness*, Dr. Lyle McNeal. McNeal testified that it would take "a lot of effort and work and time and patience," but that "[w]ith money . . . it can be fixed." He also said that restoring "Mother Nature is not easy," but that remediation was possible with "a deep pocket book." That was essentially the district court's conclusion. And with the Osguthorpes' own expert sustaining the district court's central finding, the Osguthorpes are in no position to challenge the court's finding as clearly erroneous.

¶40 For similar reasons, we cannot fault the district court for declining to award the Osguthorpes equitable relief. Their alleged injuries—of harm and threatened harm to their sheep and to the land they depended on for "forage"—are the types of injuries typically found compensable in monetary damages.[7] And of course

---

tions deferentially where the issues presented are "likely to be so complex and varying that no rule adequately addressing the relevance of all the[] facts can be spelled out" in a binding appellate decision (internal quotation marks omitted)); *see also* 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRACTICE & PROCEDURE § 2962 (3d ed. 1998) (stating that trial courts have "considerable discretion" in deciding whether to grant injunctive relief and that "the fact that the appellate court [would] reach[] a contrary conclusion does not warrant a reversal").

[7] *See, e.g.*, *Park v. Moorman Mfg. Co.*, 241 P.2d 914, 921 (Utah 1952) (establishing measure of damages for "chickens destroyed"); *Evans v. Highland Boy Gold Min. Co.*, 76 P. 1135, 1135 (Utah 1904) (laying out standard to measure damages for destruction of crops and fruit trees); *Ault v. Dubois*, 739 P.2d 1117, 1120–22 (Utah Ct. App. 1987) (establishing measure of damages for injuries to land, trees, and shrubbery); *see also* O. H. Webster, Annotation, *Measure and*

that premise was reinforced by the Osguthorpes' own expert witness.

¶41 As the district court noted, the Osguthorpes themselves initially sought money damages in this very case—in their claim for *waste*.[8] Their voluntary abandonment of that claim at least arguably undermined their request for injunctive relief.

¶42 With all the above in mind, it seems hard to fault the district court for denying the Osguthorpes' request for injunctive relief. We cannot conclude that the court abused its discretion. And we affirm its decision on that basis.

C

¶43 The final question concerns the trial court's reformation of the 2001 Restatement of Agreement. In reforming that contract to reflect the parties' intentions, the court gave the reformed contract only prospective application (from August 2011 forward). Retroactive application, in the trial court's view, would have "work[ed] injustice on both ASC and The Estate of Enoch Smith." Specifically, for the period prior to 2006, the court noted that the Smith estate had a valid legal claim to half of the entire annual payment ($100,000 per year). And from 2006 to 2010, the court stated that the Osguthorpes had not performed any services for ASC. For those reasons, the court concluded that retroactive application of the reformed contract would result in inequity. The court also made a sua sponte conclusion that neither the Osguthorpes nor the Smith estate had a right to the payments tendered (but rejected) from 2006 to 2011.

¶44 The Osguthorpes challenge the decision not to give the reformed agreement retroactive application. They also question the propriety of the district court's conclusion that neither the Osguthorpes nor the Smith estate have a right to payments tendered by ASC but rejected by the Osguthorpes. We review these deci-

---

*Elements of Damages, in Action Other Than One Against a Carrier, for Conversion, Injury, Loss, or Destruction of Livestock*, 79 A.L.R. 2d 677 (1961) (collecting abundant cases establishing the measure of damages for lost horses, cows, mules, hogs, bulls, turkeys, and, of course sheep).

[8] *See Dugan v. Jones*, 724 P.2d 955, 957 (Utah 1986) ("A plaintiff alleging waste can establish the measure of damages by showing either the difference in market value before and after the injury, or the cost of restoration.").

sions under a deferential —abuse of discretion —standard of review. *See Collard v. Nagle Constr., Inc.*, 2006 UT 72, ¶ 13, 149 P.3d 348 (reviewing the propriety of a district court's decision to "fashion[] the equitable remedy" under an abuse of discretion standard, noting the district court's unique "ability to balance facts and craft equitable remedies and our [corresponding] hesitance to act as a Monday morning quarterback in such matters" (alteration in original) (internal quotation marks omitted)).

¶45 The threshold decision to give the reformed agreement only prospective application easily survives under this deferential standard. Granted, there is a "general rule" that "reformation of a written contract relates back and takes effect from the date of the contract's original execution." *Warner v. Sirstins*, 838 P.2d 666, 670 (Utah Ct. App. 1992). But the general rule is subject to an exception. Third parties "who have . . . relied on the finality of a consensual transaction in which they have acquired an interest in property" should be protected in the reformation of an agreement negatively affecting that interest in property. RESTATEMENT (SECOND) OF CONTRACTS § 155, cmt. f.[9] And, with this in mind, reformation is appropriate only "if the rights of third parties are not affected," *Guardian State Bank v. Stangl*, 778 P.2d 1, 5 (Utah 1989), or in other words "to the extent that rights of third parties . . . will [not] be unfairly affected," RESTATEMENT, *supra*, § 155.

¶46 The district court acted well within its discretion in giving the reformed agreement only prospective effect. Its decision rested in substantial part on its concern for the effect of the reformation on the Smith estate. In light of the estate's 50 percent interest in the payments made under the unreformed Restatement of Agreement, the court identified an inequity that would result from retroactive reformation that could affect the estate's rights. That was a sufficient basis for the timing limitation imposed by the court under the above-cited authority. We affirm that decision as a matter well within the court's discretion.

¶47 That leaves the district court's conclusion regarding the rights of the Osguthorpes and the Smith estate in the payments tendered by ASC and refused by the Osguthorpes. The Osguthorpes challenge the district court's finding that neither the

---

[9] *See also, e.g., Katzenberger v. State*, 735 P.2d 405, 408 n.1 (Utah Ct. App. 1987); *L.E. Myers Co. v. Harbor Ins. Co.*, 384 N.E.2d 1340, 1345 (Ill. App. Ct. 1978); *Dumais v. Gagnon*, 433 A.2d 730, 737 (Me. 1981).

Osguthorpes nor the Smith estate had any right to the tendered payments as a matter beyond the scope of the court's equitable discretion. The challenge is well taken.

¶48  The reformation claim asserted by the Osguthorpes did not implicate any party's right to payment under the Restatement of Agreement. It raised only the question of whether and to what extent the Restatement of Agreement should be reformed to reflect the parties' intent. Once the court resolved to reform the contract, and to make the reformation prospective-only, its authority to craft equitable relief was at an end.

¶49  The trial judge has a range of discretion in crafting an appropriate equitable remedy. But the judge is barred from "granting [] relief on issues neither raised nor tried." *Cornia v. Cornia*, 546 P.2d 890, 893 (Utah 1976). The question of the Osguthorpes' right to payment under the Restatement of Agreement from 2006 to 2011 is a matter that was neither raised nor tried in the district court. ASC tendered payments to the Osguthorpes through much of this period of time, and the Osguthorpes rejected the tender. But the claims that were litigated in the district court did not concern the parties' competing rights to the tendered payments; they concerned the Osguthorpes' requests for rescission and, alternatively, for reformation of the contract.

¶50  In concluding that the Osguthorpes were not entitled to the tendered payments because they provided no services to ASC during the relevant period of time, the district court reached out to decide issues that were neither raised nor litigated. ASC has not asserted a claim for breach of contract against the Osguthorpes for failing to render services. And the Osguthorpes have not asserted a claim to the moneys tendered by ASC (e.g., as an alternative to rescission).[10] The Osguthorpes' right to the tendered funds is thus a matter beyond the scope of the claims asserted in this suit. We vacate the district court's conclusion on this point on that basis.

¶51 We likewise vacate the district court's determination that the Smith estate has no right to payment from the tendered funds. This is another matter that was not implicated by the claims liti-

---

[10] In so noting, we are not ruling that such claims would be viable in a subsequent suit; such claims could well be barred as a matter of res judicata. We are only noting that no such claims have been asserted in this case, and thus that the issues they implicate were not properly presented to the district court.

gated in the district court. Indeed, the Smith estate's rights could not have been litigated in this proceeding, as the estate was not a party to the proceeding (and in fact was denied leave to intervene), and a decision abrogating its rights without its participation would have infringed its right to notice and an opportunity to be heard.[11] Thus, the district court had no authority to dispose of the Smith estate's rights, and we vacate its determination on this matter on that basis.

––––––––––––

[11] *See Houser v. Smith*, 56 P. 683, 685 (Utah 1899) ("Courts have no right to dispose of and adjudicate upon the property rights of persons who are not parties to the case, and who are total strangers to the record."); *Bonneville Tower Condo. Mgmt. Comm. v. Thompson Michie Assocs., Inc.*, 728 P.2d 1017, 1019 (Utah 1986) ("A plaintiff may not obtain relief adverse to the property rights of others who are not adverse parties to the case without bringing them before the court.").