NATIONAL EQUIPMENT RENTAL, LTD., Plaintiff-Appellant,

v.

H. Walter HENDRIX, III and Jean K. Hendrix, Defendants-Appellees.

No. 259, Docket 77-7239.

United States Court of Appeals, Second Circuit.

Argued Nov. 11, 1977.

Decided Nov. 11, 1977.

Jonathan V. Pollack, Mineola, N. Y. (Gerald S. Jacobs, Charles Jacobson, Lake Success, N. Y., and Marcus, Maltinsky & Katz, Mineola, N. Y., of counsel), for plaintiff-appellant.

Mark S. Arisohn, Stanley S. Arkin, New York City, of counsel, for defendants-appellees.

Before KAUFMAN, Chief Judge, and SMITH and MULLIGAN, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

This appeal brings into question a jury finding that two so-called "equipment lease" agreements entered into between National Equipment Rental, Ltd. (NER) and H. Walter Hendrix, III, were, in actuality, usurious loan agreements void under New York State law. That determination, and the resulting dismissal of NER's complaint seeking amounts still due on those agreements, are attacked on three grounds. NER contends that Hendrix was improperly granted a jury trial in the face of a contractual clause waiving such a right; that there was insufficient evidence to support the jury's finding; and that the New York State usury laws are not intended to apply to transactions such as the ones here involved. We find these contentions without merit, and affirm.

I

H. Walter Hendrix, III, the proprietor of a small construction company in Lexington, South Carolina was purchasing two pieces of heavy equipment, paying $5,200 per month to the Jeff Hunt Machinery Co. towards the $103,000 purchase price of a tractor-scraper, and $2,000 per month to the Western Carolina Tractor Co. towards the $50,000 purchase price of a bulldozer. After discharging some $20,000 of each debt, Hendrix became unable to satisfy these obligations. Hendrix testified that he told Reed Hanna, a salesman for Jeff Hunt, that he wanted to obtain a loan whereby he could settle his accounts with the two dealers and reduce his monthly payments to a sum less than $7,200.

Shortly thereafter, Hanna arranged for Robert P. Kelly, a man Hendrix knew was in the financing business, to see Hendrix. As a solution to Hendrix's financial woes, Kelly urged Hendrix to sign certain printed form agreements obtained from John Shoup, NER's branch manager for the Carolina region. According to Hendrix, he questioned the designation of the agreements as "equipment leases" but was assured that was the way NER loaned its money. Hendrix further testified to his

desire to consult an attorney, but was dissuaded by Kelly from doing so. With these assurances, Hendrix executed the agreements, and his wife was required by NER to provide a guarantee. For his intercession, Kelly received a commission of $2,437.34 from NER.

Upon receiving favorable credit information regarding the Hendrixes, NER (through its Vice President, Gerald Jacobs) signed the agreements, and forwarded $31,161.62 to the Western Carolina Tractor Co. and $84,442.74 to the Jeff Hunt Machinery Co. These amounts constituted the remaining balance on the two pieces of equipment. While Jacobs testified that he had no idea the sums reflected exactly the extent of Hendrix's indebtedness, Hendrix, not surprisingly, claimed that the payments were intended by both parties to be personal loans—paid directly to creditors—to cover the outstanding balance on the equipment. Shortly after the agreements were executed, NER filed financing statements to formalize its security interest under Article 9 of the U.C.C., and assigned the agreements to the First National Bank of Chicago as partial security for its own loans.

Under the agreements, Hendrix was obligated to pay $866.29 each month for 49 months for the bulldozer and $2,744.39 each month for 42 months for the tractor-scraper. The testimony regarding the manner in which these sums were arrived at is in dispute. While Jacobs claims that they reflected the purchase price of the equipment, adjusted to account for NER's overhead costs, Hendrix asserted that NER arrived at the figures simply by applying an interest rate, higher than the prime rate, to the amount of cash it advanced. The agreements further provided that Hendrix was to have an option to purchase the bulldozer and was required, at NER's option, to purchase the tractor. The permissive and mandatory options were exercisable at the expiration of the terms of each agreement for an additional lump sum payment by Hendrix of 10% of NER's cash advance. Finally, pursuant to a rider accompanying the main agreements, Hendrix was required to pay state use taxes for the machinery, bear all risk of loss, pay for repairs, and insure the equipment against loss.

These agreements reflected the character of NER's business. Simply enough, NER advances cash and collects monthly payments, securing its expenditures by obtaining a security interest in the machinery which remains in the debtor's possession. It neither inspects, appraises, repairs nor sells the equipment; indeed, without showrooms or physical plant, it is clear that its only inventory is money.

After Hendrix made four monthly payments, he defaulted. The equipment was seized and sold by NER at a private sale where it realized $76,500 of its original outlay of $115,604.36. The instant suit against Hendrix for the difference followed. In his answer to NER's complaint, Hendrix interposed both the affirmative defenses of usury and the unreasonableness of the disposition sale. After NER made an unsuccessful preliminary motion to strike Hendrix's demand for a jury trial, the matter proceeded to a first trial before Judge Weinstein and a jury in September 1976. The jury then found that the disposition sale was commercially unreasonable under Article 9 of the U.C.C. A judgment reflecting this determination was not signed or entered, however, for Judge Weinstein had already directed a second trial on the issue of usury. NER then for a second time moved without success to strike Hendrix's demand for a jury trial. The matter proceeded to trial and the jury found that the two transactions were loans. Judge Weinstein thereupon dismissed the complaint and this appeal followed.

### II

At the outset, we note the question of the commercial reasonableness of the disposition sale is not before us, despite appellant's extended discussion of the matter. In our view, only three issues are raised: Hendrix's right to a jury trial; the sufficiency of the evidence adduced to support the jury's findings; and the intent of the New York usury laws.

NER first claims that it was reversible error for the trial court to have granted Hendrix's demand for a trial by jury, basing its contention on a provision literally buried in the eleventh paragraph of a fine print, sixteen clause agreement. Embedded there are the crucial words: "Lessee hereby waives a trial by jury . . .."

■ It is elementary that the Seventh Amendment right to a jury is fundamental and that its protection can only be relinquished knowingly and intentionally. *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Heyman v. Kline*, 456 F.2d 123, 129 (2d Cir. 1972), *cert. denied*, 409 U.S. 847, 93 S.Ct. 53, 34 L.Ed.2d 88 (1972). Indeed, a presumption exists against its waiver. *Aetna Insurance Co. v. Kennedy,* 301 U.S. 389, 393, 57 S.Ct. 809, 81 L.Ed. 1177 (1937). There is little doubt that the provision relied on by NER fails to overcome this presumption. The waiver clause was set deeply and inconspicuously in the contract, and Justice Black, dissenting in *National Equipment Rental, Ltd. v. Szukhent*, 375 U.S. 311, 332–3, 84 S.Ct. 411, 423, 11 L.Ed.2d 354 (1964) aptly characterized the nature of NER's form agreements:

> this printed form provision buried in a multitude of words is too weak an imitation of a genuine agreement to be treated as a waiver of so important a constitutional safeguard . . . it exhausts credulity to think that they or any other layman reading these legalistic words would have known or even suspected that they amounted to [such] an agreement . . . .[1]

Moreover, it is clear that Hendrix did not have any choice but to accept the NER contract as written if he was to get badly needed funds. This gross inequality in bargaining power suggests, too, that the asserted waiver was neither knowing nor intentional. See *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

■ Second, NER argues that there was insufficient evidence to support the jury's finding that the transactions between Hendrix and NER were in fact, and were intended by the parties to be, loans. It is clear to us, however, that there was ample evidence to sustain the jury's determination. The jury could have relied, *inter alia*, on Hendrix's testimony that he told both Hanna and Kelly of his need for a long term loan; on the character of the transaction and, particularly, on Hendrix's continuing responsibility to repair and insure the machinery; on the nature of NER's business; and on the manner in which NER calculated the monthly payments through the use of interest tables correlated with the prime rate.

Our decision in *National Equipment Rental, Ltd. v. Stanley*, 283 F.2d 600 (2d Cir. 1960) is compellingly similar. There, NER had advanced funds to Stanley to enable him, in part, to repay a vendor from whom he had originally bought drugstore equipment. Under an agreement, called a "lease", Stanley was to repay NER monthly and keep possession of the equipment. When Stanley defaulted, NER sued to recover the accelerated unpaid "rentals." Stanley's defense that the agreement was a usurious loan was successful with a jury, and we affirmed the judgment dismissing NER's complaint. We found the following evidence sufficient to support the jury verdict: NER told Stanley that it would lend him money; NER did not inspect the equipment; and it required a financial statement from Stanley. Appellant does not—indeed, it could not—suggest any compelling distinction between the instant facts and *Stanley*.

---

1. In *Szukhent*, the Supreme Court, by a 5–4 vote, upheld a provision in a similar contract providing that service of process could be made on an agent designated in the document. The right to a jury trial, however, is far more fundamental than the right to personal service, and cannot be waived absent a showing that its relinquishment is knowing and intentional. *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983,

32 L.Ed.2d 556 (1971) provides a compelling analogy. There, the Court refused to uphold a contractual provision waiving due process rights, noting that there was "no showing whatever that the appellants were actually aware or made aware of the significance of the fine print now relied upon as a waiver of constitutional rights." *Id.* at 95, 92 S.Ct. at 2002. No such showing has been made here.

NER finally argues that the New York State usury laws do not apply to the instant transactions because Hendrix used the funds advanced by the NER for a business purpose, and because Hendrix was not the hapless consumer whom the usury laws were designed to protect.

The mere fact that the proceeds of a loan are to be used in the debtor's business does not preclude that individual from raising the defense of usury. Indeed, in *Ranhand v. Sinowitz*, 26 N.Y.2d 232, 309 N.Y.S.2d 323, 257 N.E.2d 877 (1970), the New York Court of Appeals noted that a borrower could raise the defense even though the proceeds of a loan were applied to the benefit of his wholly-owned corporations. Nor do New York General Obligations Law §§ 5–501(6) and 5–521, which bar the defense of usury in transactions involving, respectively, sums greater than $250,-000 and corporate borrowers, prevent the assertion of the defense in this case. Of course, as appellant concedes, the instant loan fits neither of these categories. But of far greater import is the fact that Hendrix was compelled to borrow from NER on NER's terms to avoid losing the equity he had in the equipment, the equipment itself, and his livelihood. The usury laws were clearly intended to apply to just such a situation: of a needy individual forced, because of the creditor's greater bargaining power, to borrow at oppressive rates.

Finding no merit in appellant's contentions, we affirm the order of the district court.