2018 UT App 78

# THE UTAH COURT OF APPEALS

CAMCO CONSTRUCTION INC., KEYBANK NATIONAL ASSOCIATION,
SHARRON TROSZAK, AND DALE CONDER,
Appellees,
*v.*
UTAH BASEBALL ACADEMY INC., ATHLETIC PERFORMANCE
INSTITUTE LLC, AND ROBERT KEYES,
Appellants.

Opinion
No. 20150932-CA
Filed April 26, 2018

Third District Court, Salt Lake Department
The Honorable Anthony B. Quinn
No. 050918901

Denver C. Snuffer Jr. and Daniel B. Garriott,
Attorneys for Appellants

Joseph E. Minnock, Attorney for Appellee
Camco Construction Inc.

R. Stephen Marshall, Steven J. McCardell, and
Michael S. Malmborg, Attorneys for Appellees
KeyBank National Association, Sharron Troszak,
and Dale Conder

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN M. HARRIS and DIANA HAGEN concurred.

MORTENSEN, Judge:

¶1 When the bank that funded the construction of an athletic facility balked at advancing more funds for the project, the owner of the facility cried foul. Several years of litigation followed, culminating in a bench trial. This appeal presents the

opportunity for us to review many of the calls made by the trial court leading up to and following trial. We affirm in all respects.

BACKGROUND

¶2 KeyBank National Association provided Athletic Performance Institute LLC (API) financing for a twelve-month construction project to build an indoor athletic facility, which would then convert to a twenty-year, $1.9 million loan. API planned to lease the facility to Utah Baseball Academy Inc. (UBA). Robert Keyes owned both API and UBA. Keyes and UBA guarantied the loan to API. Appellants hired Camco Construction Inc. as the general contractor in the construction of the facility.[1]

¶3 While the building was meant to "accommodate multiple sports," "a floor elevation problem" resulted in the facility only being suitable for baseball. This floor elevation issue was one of many problems that arose with both the funding and construction of the facility. When API and Camco could not resolve these disputes, Camco filed a mechanic's lien and, eventually, a lawsuit against API. Camco brought KeyBank into the suit "to assert lien priority."

¶4 Throughout the construction process, API filed draw requests with KeyBank, which KeyBank would pay out of the loan. One particular draw request—Draw Request No. 6—was not immediately funded because of the mechanic's lien. This draw request became a source of conflict between API and KeyBank, and API ultimately asserted claims for damages against KeyBank.

---

1. We refer to API, UBA, and Keyes collectively as Appellants.

¶5     Another source of conflict between API and KeyBank arose in the context of the payment of accrued interest on the loan. While the loan documents were silent as to how such interest was to be handled, KeyBank made interest payments starting at the beginning of the loan period. At some point, KeyBank stopped making these payments. This gave rise to another claim for damages.

¶6     The proceedings in the trial court were long and complex. API filed a third party complaint against additional entities—Sporturf and Evergreen—and the trial court eventually bifurcated the related claims. The bifurcation led the trial court, in part, to conclude that the jury waiver included in KeyBank and API's loan documents should be enforced. Thus, the trial court heard Appellants' claims against KeyBank in a bench trial.

¶7     However, not all claims were heard at the bench trial, since the trial court had disposed of several of the claims on summary judgment. One claim peripheral to this appeal centered on a $15,000 payment from Keyes to a KeyBank employee, Roger Preston. The money came from API's construction equity account. This payment was problematic for a number of reasons, and KeyBank ultimately "refunded the $15,000, plus interest, and unconditionally tendered additional interest to API."

¶8     Appellants now challenge the results of the trial.


ISSUES

¶9     The issues raised on appeal fall into four main categories. First, Appellants argue that the trial court improperly granted summary judgment to KeyBank on several of Appellants' claims. Second, they argue that the trial court erroneously granted KeyBank's motion to strike Appellants' jury demand. Third, they argue that several of the court's trial rulings were unsupported.

Fourth, they argue that the trial court erred in denying their motion for a mistrial. We address these contentions in turn.

ANALYSIS

I. Summary Judgment

¶10    We review a trial court's grant of summary judgment for correctness. *Overstock.com, Inc. v. SmartBargains, Inc.*, 2008 UT 55, ¶ 12, 192 P.3d 858.

¶11    On summary judgment, the trial court disposed of several of Appellants' claims. Those claims were for intentional infliction of emotional distress (IIED), lost profits, and fraud. We conclude that the trial court properly granted summary judgment in all three respects.

A.    Intentional Infliction of Emotional Distress

¶12    In Utah, a plaintiff is entitled to damages

> where the defendant intentionally engaged in some conduct toward the plaintiff, (a) with the purpose of inflicting emotional distress, or, (b) where any reasonable person would have known that such would result; and his actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality.

*Jackson v. Brown*, 904 P.2d 685, 687–88 (Utah 1995) (citation omitted). The trial court concluded that under relevant precedent, the IIED claim that Appellants asserted could not survive as a matter of law, where they "fail[ed] to allege a distinct and palpable injury that isn't derivative of the harm to the companies." (Citing *Stone Flood & Fire Restoration, Inc. v.*

*Safeco Ins. Co. of Am.*, 2011 UT 83, ¶ 40, 268 P.3d 170.) The court further concluded that "as a matter of law there is not an allegation of sufficiently outrageous conduct to give rise to a claim for intentional infliction of emotional distress."

¶13   Appellants brought an IIED claim for alleged behavior connected to KeyBank's failure to pay Draw Request No. 6. Appellants argue that because there were disputed facts regarding whether KeyBank "fail[ed] to fund Draw 6 in a timely manner" and "failed to cooperate with API's replacement financing," summary judgment was inappropriate and the IIED claim should have been decided at trial. But in granting summary judgment on this issue, the trial court did not find facts or even conclude that there were no disputed facts. Instead, its ruling implicitly determined that any disputed facts were immaterial. In other words, whether or not KeyBank failed to fund the draw request or cooperate with replacement financing had no bearing on the outcome of the case; what mattered is that Appellants asserted the claim on behalf of two corporate entities and a private individual, revealing that either the claim was made on behalf of a corporation or the claim was derivative of injury to a corporation. Both situations required the trial court to grant summary judgment.

¶14   To begin, Keyes's claim for IIED could not stand inasmuch as it rested on conduct directed at either API or UBA. In *Stone Flood*, our supreme court addressed an analogous situation. *See id.* ¶¶ 32–44. The court considered whether shareholders could pursue a claim for IIED that stemmed from an injury to a corporation. *See id.* ¶ 41. Ultimately, the court concluded that the shareholders could not "pursue damages for injuries that are derivative of the corporation's." *Id.*

¶15   Relying on *Stone Flood*, the trial court determined that "all of the acts that are alleged . . . should be dismissed under that decision because they fail to allege a distinct and palpable injury

that isn't derivative of the harm to the companies." We agree. Appellants claim that summary judgment was inappropriate because "KeyBank failed to submit or lost Draw 6 on multiple occasions," "lied to Camco about Mr. Keyes not approving payment," "failed to cooperate with API's replacement financing," and "wrongly raised the payoff amount" of the loan. But all of these alleged facts speak to conduct directed at corporations. Under *Stone Flood*, a private individual cannot succeed on an IIED claim for such behavior. *See id.*

¶16    Likewise, neither API nor UBA could recover for the alleged conduct. Several jurisdictions have expressly held that corporations cannot suffer emotional distress.[2] This is a logical tenet: because "a corporation lacks the cognizant ability to experience emotions, a corporation cannot suffer emotional distress. Thus, no claim for intentional infliction of emotional distress lies." *FDIC v. Hulsey*, 22 F.3d 1472, 1489 (10th Cir. 1994). We are persuaded by this tenet and therefore conclude that, contrary to Appellants' assertion, the trial court's ruling on this issue did not disregard any material disputes of fact. It is undisputed that both API and UBA are corporate entities; as such, they are—as a matter of law—incapable of succeeding on a claim for IIED. *Cf. Bross Enters., Inc. v. Town of Chesterton*, No. 2:13 CV 217, 2016 WL 5724358, at *3 (N.D. Ind. Sept. 29, 2016). ("The parties focus their argument on whether the conduct . . . is

---

2. *See, e.g.*, *FDIC v. Hulsey*, 22 F.3d 1472, 1489 (10th Cir. 1994); *Bross Enters., Inc. v. Town of Chesterton*, No. 2:13 CV 217, 2016 WL 5724358, at *3 (N.D. Ind. Sept. 29, 2016); *F.P.D., Inc. v. Hartford Cas. Ins. Co.*, No. CV 15-04419 DMG (E), 2015 WL 12806477, at *3 (C.D. Cal. Oct. 6, 2015); *Advanced Sleep Center, Inc. v. Certain Underwriters at Lloyd's, London*, Civil Action No. 14-592, 2014 WL 2768801, at *2 (E.D. La. June 18, 2014); *Interphase Garment Sols., LLC v. Fox Television Stations, Inc.*, 566 F. Supp. 2d 460, 466 (D. Md. 2008).

outrageous enough to establish the tort. In so doing they miss a larger problem: the only plaintiff in this action is a corporation, and a corporation cannot suffer mental anguish and so cannot recover in tort for intentional infliction of emotional distress.").

¶17 The parties and the trial court also addressed an issue personally experienced by Keyes, which both the parties and the court referred to as stalking. Appellants argue they presented evidence that KeyBank's stalking inflicted severe emotional distress upon Keyes and his family: "his family going into hiding because they felt threatened, serious stress-related health issues, financial ruin." But this recitation of evidence presented deals only with the result of KeyBank's behavior; it does not address the behavior itself. This is problematic, given that the trial court's grant of summary judgment rested on its assessment of Key Bank's behavior and its conclusion that the behavior was "not sufficiently outrageous to justify a claim for intentional infliction of emotional distress." In forming this conclusion, the trial court recounted the behavior at issue:

> What we're talking about here is three visits to the API facility by Mr. Preston, which he may, or may not, have had business there and may, or may not, have ever seen Mr. Keyes, and one incident where he may, or may not, have been parked on the same street as the Keyes family. There isn't any spin that you could put on that that makes that, in and of itself, rise to the level of outrageous conduct . . . .

Accordingly, the trial court granted KeyBank's motion for summary judgment.[3]

---

3. Although the trial court "grant[ed] the motion to dismiss the second cause of action," the parties address the IIED disposition in summary judgment terms. A review of the record also reveals

(continued…)

¶18   Appellants argue that the trial court should have denied the motion "because of genuine [disputes] . . . of material fact." But in so arguing, Appellants do nothing more than set forth the same facts the trial court relied on in concluding that the conduct did not rise to the level necessary for intentional infliction of emotional distress. What one would expect Appellants to focus on, instead, is how the trial court's conclusion—that the conduct was not sufficiently outrageous—was erroneous. But on this point, Appellants again state only that "there were facts precluding summary judgment." Even if this were enough to satisfy Appellants' briefing requirements,[4] we would affirm because the trial court correctly determined that the conduct, as alleged, was insufficient to rise to an outrageous level.

¶19   In *Nguyen v. IHC Health Services, Inc.*, 2010 UT App 85, 232 P.3d 529, we approved of a district court's grant of summary judgment where the movant had argued "that even if all of [the plaintiff's] assertions could be proven, the conduct as described did not establish that Defendants acted outrageously." *Id.* ¶¶ 8–9.

---

(…continued)
that the motion pending at the time of the court's ruling was indeed one for summary judgment.

4. "An adequately briefed argument contains the contentions and reasons of the appellant with respect to the issues presented with citations to the authorities, statutes, and parts of the record relied on. Implicitly, rule 24(a)(9) [of the Utah Rules of Appellate Procedure] requires not just bald citation to authority but development of that authority and reasoned analysis based on that authority. A reviewing court is not simply a depository in which the appealing party may dump the burden of argument and research. Accordingly, we may refuse, sua sponte, to consider inadequately briefed issues." *Hampton v. Professional Title Services*, 2010 UT App 294, ¶ 2, 242 P.3d 796 (cleaned up).

That is essentially what we have here. The trial court concluded that, as a matter of law, the conduct at issue in the present case was not outrageous. The court was entitled to form such a conclusion. *See Prince v. Bear River Mutual Ins. Co.*, 2002 UT 68, ¶ 38, 56 P.3d 524 ("If the trial court determines that a defendant's conduct was not outrageous as a matter of law, then the plaintiff's claim fails, and a court may properly grant the defendant summary judgment on an intentional infliction of emotional distress claim. A court is to determine whether a defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." (cleaned up)).

¶20 For purposes of IIED, outrageous conduct is

> conduct that evokes outrage or revulsion; it must be more than unreasonable, unkind, or unfair. Additionally, conduct is not outrageous simply because it is tortious, injurious, or malicious, or because it would give rise to punitive damages, or because it is illegal.

*Id.* (cleaned up). The conduct at issue in this case—parking near someone's house, visiting a facility where that person works three times, and threatening to sue—simply is not the sort of behavior for which plaintiffs can recover under a theory of intentional infliction of emotional distress. It does not evoke outrage or revulsion. *See id.* It is no more than unreasonable, unkind, or unfair. *See id.* And because reasonable people "could [not] differ as to whether the conduct . . . was so outrageous and extreme that it offended the generally accepted standards of decency and morality," summary judgment was proper. *Gygi v. Storch*, 503 P.2d 449, 401–02 (Utah 1972).[5]

---

5. We note that the trial court's concerns on the IIED claim based on the purported stalking behavior extended beyond whether it

(continued…)

B.      Lost Profits

¶21    Appellants next challenge the trial court's grant of summary judgment in favor of KeyBank on Appellants' claim for lost profits. Essentially, Appellants had claimed that KeyBank's "failure to timely pay draw requests resulted in a failure to correct the elevation difference between the baseball field and the basketball court, which made the facility unusable, and resulted in a loss of profits for the times when it otherwise would have been available to be used." KeyBank moved for summary judgment on this claim, which the trial court granted because "the undisputed evidence" showed "that it was not [Camco]'s responsibility to fix this." Further, the court concluded that "there is no admissible evidence in the record that [Camco] would have been willing to correct the elevation difference had they been timely paid with respect to draw request number 6, or the other draw requests." The court thus granted summary judgment.

¶22    Now, Appellants contend that in so ruling, the trial court erroneously "ignored the evidence, interpreted and weighed evidence, and construed facts in a light most favorable to KeyBank." We conclude that even if Appellants are correct on

_____

(…continued)

was sufficiently outrageous. Apparently, the facts surrounding "the alleged stalking of the Keyes family" were "not alleged in the second amended counterclaim" and instead were asserted for the first time "in opposition to KeyBank's summary judgment motion." The trial court nevertheless considered the merits of this claim, concluding "that, even if you accept it as true, and even if you would ignore the fact that it is not alleged in the second amended counterclaim and, arguably, not even part of the case, it is, taken alone, not sufficiently outrageous to justify a claim for intentional infliction of emotional distress."

this point, the issue is now moot. *Cf. Hahnel v. Duchesne Land, LC*, 2013 UT App 150, ¶ 23, 305 P.3d 208 ("The challenge to the trial court's summary judgment limiting Buyers' damages is moot because the jury found that Sellers had not breached the contract.").

¶23   Following trial, the court entered extensive findings of fact and conclusions of law. Among them, the trial court outlined the following: (1) "Perhaps the key issue in the case is whether any mishandling of Draw Request No. 6 on the part of KeyBank resulted in any damage to API"; (2) "API seeks damages for all sums they incurred as a result of any technical default under the Construction Loan and for all sums incurred in litigation with Camco"; (3) "API's claims of causation are . . . undermined by the fact that, in any event, construction defects would have prevented further advances on the Loan"; and (4) "API has proven no damages that resulted from the delay" in "processing Draw Request No. 6."

¶24   Appellants had presented their lost profits claim as a form of damages they sought for the failure of KeyBank to timely pay Draw Request No. 6. Because the court ultimately found that "*no damages . . . resulted from the delay,*"[6] the question of whether any of the defendants might be legally responsible for consequential damages is moot because there were no damages to be recovered. *See id.*; *see also McBride v. Utah State Bar*, 2010 UT 60, ¶ 13, 242 P.3d 769 ("An issue is moot when the requested judicial relief cannot affect the rights of the litigants." (cleaned up)). We therefore decline to consider this issue further.

C.   Fraud

¶25   The trial court also granted summary judgment on Appellants' claim of fraud. Appellants devote just one

---

6. We expressly affirm this factual finding. *See infra* ¶¶ 50–51.

paragraph of their brief to arguing that this grant of summary judgment was in error.[7] This paragraph contains no citations to the record, no reference to the grounds on which the trial court granted summary judgment, and no analysis of relevant case law as it applies to the facts of the case. We decline to perform Appellants' job for them and therefore affirm the trial court's grant of summary judgment for the fraud claim on the ground of inadequate briefing. *See Hampton v. Professional Title Services*, 2010 UT App 294, ¶ 2, 242 P.3d 796.

---

7. The following is the entire analysis Appellants devoted to this issue:

> For constructive fraud, Utah requires only "two elements: (i) a confidential relationship between the parties; and (ii) a failure to disclose material facts." *Jensen v. IHC Hosps.*, 944 P.2d 327, 339 (Utah 1997) (emphasis added). There is no requirement to establish damages. API had a confidential relationship when KeyBank designated themselves as the "fiduciary" over API's funds. API had no signature authority on the funds. As fiduciary KeyBank was required to insure funds were used solely for construction of the baseball facility and no other purpose. KeyBank breached that duty by allowing $15,000 to go to a bank Vice-President. KeyBank failed to disclose and worked to conceal these facts from API. They say they concealed the facts because they considered Keyes a "suspect." Keyes had no authority to make withdrawals, nor did he receive the Construction Equity Account statements. This claim was wrongly dismissed on summary judgment.

(Emphasis in original.)

## II. Grant of Motion to Strike Jury Demand[8]

¶26 We review a trial court's conclusion that a party waived its right to a jury trial for an abuse of discretion. *Aspenwood, LLC v. C.A.T., LLC*, 2003 UT App 28, ¶ 33, 73 P.3d 947.

¶27 KeyBank moved "to strike the jury demand of Robert Keyes, Utah Baseball Academy, Inc., and Athletic Performance Institute, L.L.C." because those parties had "signed multiple jury waivers in connection with the loan transactions that form the basis for this lawsuit." Appellants opposed this motion, arguing: "[t]he right to trial by jury in civil cases is guaranteed by the

---

8. Following the trial court's order granting KeyBank's motion to strike, Appellants filed a motion to reinstate their right to a jury. It is unclear whether they appeal from the grant of KeyBank's motion or the denial of their own. In their statement of relevant facts, Appellants summarize both motions. In the argument section of Appellants' brief, they assert the general law regarding the constitutional right to a jury, then re-argue the reasons the waiver should not be enforced. Finally, at the end of their argument, Appellants mention the trial court's Order Denying Motion to Reinstate. But they do so only in the context of the trial court's separate rulings to dismiss the lost profits claim—which we have already addressed—and the court's decision to bifurcate claims asserted against another defendant, Sporturf—which has not been challenged on appeal. While one of Appellants' subheadings includes the assertion that "[t]he trial court erred in bifurcating," this assertion does not appear in the statement of issues, is accompanied by no statement of preservation, and is not briefed with citations to the record or relevant authority. Because the end result is the same, it matters little which motion we analyze. Thus, as the arguments regarding the jury right were first and thoroughly developed in response to KeyBank's motion to strike, we address that motion.

Seventh Amendment"; the right to a "jury trial may only be waived if done knowingly and intentionally"; and "[t]he jury waiver KeyBank inserted in KeyBank's loan documents is unconstitutionally overbroad and ambiguous." The trial court granted KeyBank's motion to strike, explaining, "Contracting parties anticipate that there can be a dispute over breach when they agree to waive jury trial rights." But the court allowed that "if API Parties prevail on dispositive motions by establishing a breach of contract by KeyBank as a matter of law, the Court is willing to revisit the issue."

¶28　Because there is no question that the United States Constitution affords a right to jury trials in civil cases, *see* U.S. Const. amend. VII, we focus on Appellants' contentions as to why the jury waiver should not be enforced: the waiver was supposedly not made knowingly and voluntarily and its purported overbreadth and ambiguity.[9]

A.　Knowing and Voluntary

¶29　While Appellants cite no Utah precedent for their contention that civil jury waivers must be knowing and voluntary, we recognize that courts in federal jurisdictions have expressly held this to be the requirement. *See, e.g.*, *Whirlpool Fin. Corp. v. Sevaux*, 866 F. Supp. 1102, 1105 (N.D. Ill. 1994) (explaining that "the right to a jury trial in civil cases . . . is waivable" but that "such a waiver must be made knowingly and

---

9. To the trial court, Appellants argued a third reason why KeyBank's motion to strike should be denied—"KeyBank ha[d] waived the right to assert the jury waiver" by "failing to raise the jury waiver in a timely manner." But because Appellants do not re-assert this argument on appeal, we see no need to address it further.

voluntarily" (citations omitted)). We therefore assume the same standard applies in Utah for purposes of deciding this case.[10]

¶30    Appellants offer two reasons why the jury waiver was not made knowingly and voluntarily. First, "[i]f the documents containing the jury waiver were not read, then the clause relinquishing the right to jury could not have been knowingly and intentionally waived." Second, "[w]here a party does not have any choice but to accept the contract as written if he wants to obtain the loan, coupled with the gross inequality in bargaining power, it undermines [whether] the waiver was . . . knowing [or] intentional."

¶31    This first argument is unpersuasive because we have repeatedly and consistently held that a sophisticated party cannot assert failure to read a contract as a defense to a claim that they have waived their rights. *See Maak v. IHC Health Services, Inc.*, 2016 UT App 73, ¶ 38, 372 P.3d 64. The trial court agreed with Appellants that "it is undisputed Mr. Keyes did not read the loan documents prior to signing them." It is critical to point out that this was not a single document that Keyes chose to

---

10. Of course, Utah law is well settled that the right to a jury trial in civil cases can, indeed, be waived. *See, e.g.*, *Bradbury v. Rasmussen*, 401 P.2d 710, 712 n.2 (Utah 1965) (enforcing a waiver of jury trial made at pretrial); *Security Title Co. v. Hunt*, 337 P.2d 718, 719 (Utah 1959) (explaining that where an attorney "at the pre-trial withdrew his request for and waived a jury trial," the district court "did not abuse its discretion in refusing to grant a jury trial which appellant later again requested at the time of the trial"); *Pete v. Youngblood*, 2006 UT App 303, ¶ 31, 141 P.3d 629 (clarifying that "failure to pay the statutory fee or to serve a timely jury demand constitutes a waiver of trial by jury"); *see also* Utah R. Civ. P. 38(d) (addressing waiver of trial by jury).

sign without reading; jury waiver provisions appear in *twenty* of the loan documents.

¶32    While Appellants hold up Keyes's failure to read as a reason why the jury waiver was not made knowingly, it actually operates to support the trial court's decision to grant KeyBank's motion to strike. For instance, Appellants point out that the "jury waiver is contained in fine print at the end of several form agreements." Even assuming Appellants' characterization of the appearance of the waiver language is accurate,[11] that can hardly matter in this case, where the signatory admits he did not read the document—fine print or not.

> In any event, the failure to read an agreement provides [Appellants] no relief from the application of a jury waiver provision. *See ARH Distribs., Inc. v. ITT Commercial Fin. Corp.*, No. 87 C 511, 1988 WL 17628, at *2 (N.D. Ill. Feb. 19, 1988) (enforcing jury waiver provision despite evidence that party seeking to avoid waiver did not read contract prior to signing); *see also Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1292 (7th Cir. 1989) ("basic contract law establishes a duty to read the contract; it is no defense to say, 'I did not read what I was signing.'"). Further, having previously owned and operated several companies [Appellants] were not inexperienced business persons and were not prevented from having counsel review the Guaranty, though they chose

---

11. KeyBank argues that "the size of the font" of the jury waiver "was no smaller than the other provisions." Furthermore, KeyBank points out that the forms "contained the words 'JURY WAIVER' in all capital letters" and "include[d] the heading 'Waive Jury.'"

> not to exercise this option. *See Mellon Bank v. Miglin*, No. 92 C 4059, 1993 WL 281111, at *12 (N.D. Ill. Apr. 29, 1993) (enforcing waiver provision and noting that courts should be circumspect in helping any, but the most unsophisticated parties, where they have not read their contracts well). Therefore the language of the [jury waiver] is binding and this Court will enforce the jury waiver provision.

*See Household Commercial Fin. Services Inc. v. Suddarth*, No. 01 C 4355, 2002 WL 31017608, at *8 (N.D. Ill. Sept. 9, 2002); *see also Fleet Nat'l Bank v. Fiore Neylan Travel, Inc.*, No. CV030828385, 2004 WL 1966069, at *4 (Conn. Super. Ct. Aug. 5, 2004) ("Here again, it must be noted that a contracting party's failure to read his contract before signing it cannot excuse his obligations thereunder in the absence of accident, fraud, mistake or unfair dealing." (cleaned up)). We therefore see no abuse of the trial court's discretion where it followed the lead of so many other courts and refused to provide Appellants relief from a contract Keyes signed without reading.

¶33    The second argument on this point, regarding the parties' comparative bargaining power, is inadequately briefed. Appellants assert as a generally accepted proposition of law that a contractual jury waiver cannot be knowing and voluntary if there is "gross inequality in bargaining power." In so asserting, Appellants rely on *National Equipment Rental, Ltd. v. Hendrix*, 565 F.2d 255 (2d Cir. 1977). In that case, the Second Circuit concluded that because "a presumption exists against its waiver," and the waiving party "did not have any choice but to accept the . . . contract as written if he was to get badly needed funds," the "gross inequality in bargaining power suggest[ed] . . . that the asserted waiver was neither knowing nor intentional." *Id.* at 258. But Appellants point to no Utah case holding the same, and *National Equipment* is hardly representative of settled, universal law. *See, e.g.,* IFC Credit Corp.

*v. United Bus. & Indus. Fed. Credit Union*, 512 F.3d 989, 993–94 (7th Cir. 2008) (declining to follow *National Equipment*, holding that "an agreement to resolve a dispute in a bench trial is no less valid than the rest of the contract in which the clause appears"). Because Appellants make no mention of these conflicting legal standards, what effect federal law should have on this state court case, or whether and how Utah courts have approached the issue, we conclude that this issue is inadequately briefed. Without adequate briefing on the question of whether we should adopt the rationale of *National Equipment Rental* or *IFC Credit Corp.*, we decline to consider this issue further.

B.    Overbroad and Ambiguous

¶34    We next consider Appellants' contention that the jury waiver in this case is unenforceable because it is overbroad and ambiguous. In introducing this argument, Appellants rely on a federal court case explaining that "[c]ourts have considered a number of factors to determine whether a contractual waiver of the right to a jury was knowing and voluntary." (Quoting *Cooperative Fin. Ass'n, Inc. v. Garst*, 871 F. Supp. 1168, 1172 (N.D. Iowa 1995).) But Appellants do not explain how factors concerning knowledge and voluntariness impact an analysis of overbreadth and ambiguity. Thus, this issue is also inadequately briefed.

¶35    The right to a jury is indeed, as Appellants contend, an important one. But it is also waivable. Where Appellants have not demonstrated that the jury waiver included in the loan documents was unknowing, involuntary, overbroad, or ambiguous, they have not demonstrated that the waiver should not be enforced. We thus affirm the trial court's conclusion that Appellants had, in fact, waived their right to have a jury hear their claims.

### III. Trial Rulings

¶36    Following a bench trial,

> we review a trial court's legal conclusions for
> correctness, according the trial court no particular
> deference. We review a trial court's findings of fact
> according to the standard set out in Utah Rule of
> Civil Procedure 52(a), which provides: Findings of
> fact, whether based on oral or documentary
> evidence, shall not be set aside unless clearly
> erroneous, and due regard shall be given to the
> opportunity of the trial court to judge the
> credibility of the witnesses. A trial court's factual
> finding is deemed clearly erroneous only if it is
> against the clear weight of the evidence.

*Wilson Supply, Inc. v. Fradan Mfg. Corp.*, 2002 UT 94, ¶¶ 11–12, 54
P.3d 1177 (cleaned up).

¶37    The parties tried an eleven-day bench trial on all
remaining claims. The trial court thereafter entered its findings
of fact and conclusions of law on those claims. Appellants
challenge the outcome of the trial in several respects, none of
which we consider persuasive.

A.    Obligation to Make Interest Payments

¶38    Appellants' first argue that the trial court "erred [in]
finding KeyBank was under no obligation to make interest
payments."[12] But this issue statement is insufficient to convey
how the trial court actually ruled on this point.

---

12. Curiously, in their reply brief, Appellants take issue with
what they characterize as "KeyBank ignor[ing] that the Trial
Court decided KeyBank was obligated to make the interest

(continued…)

¶39 Appellants had alleged that "KeyBank agreed to set up and maintain a[n] automatic withdrawal system, whereby necessary payments were automatically withdrawn from API Parties' designated account." The trial court concluded that "[n]owhere in the KeyBank files or documents relating to the Construction Loans is there any" such agreement; "[t]he Loan documents are silent as to precisely how interest payments on the Construction Loan would be handled." However, the trial court found "that the Construction Loan was large enough to include amounts to pay ongoing interest during the construction phase"; "[t]here was confusion at KeyBank with respect to how interest payments were to be handled"; and "[f]or a period of time, KeyBank routinely made the monthly interest payments automatically by advancing sums sufficient to pay the interest from Construction Loan proceeds."

¶40 The trial court, in its findings of facts, went on to detail the sequence of events that led to Appellants' claim that KeyBank had acted inappropriately with regard to interest payments. Specifically, it explained that the standard

> process stopped and KeyBank showed the Loan as delinquent for a few months. When the delinquency was brought to Mr. Keyes' attention, he immediately brought the interest payments current. . . . As a result of this technical default, KeyBank accrued late [fees] for the interest payments that had not been paid on a timely basis.

_____

(…continued)
payments." Regardless, because we conclude that this issue turns on the trial court's finding that Appellants were not damaged, it makes no difference whether the trial court found that such an obligation existed.

Those late fees were included as part of the payoff of the Construction Loan.

¶41 But the trial court ultimately found that "[w]hen KeyBank understood what had happened, it unconditionally tendered a refund of the late payments, plus interest at the rate of ten percent to API." Thus, the trial court avoided answering the question of obligation, instead finding that Appellants suffered no damages by KeyBank's failure to make the interest payments.

¶42 Whether a party has been damaged is a question for the trier of fact, whose finding we disturb only if it is clearly erroneous. *See Osguthorpe v. ASC Utah, Inc.*, 2015 UT 89, ¶¶ 35, 38–39, 365 P.3d 1201. Under this standard, we have no difficulty affirming the trial court's finding that Appellants were not damaged. Not only were late fees refunded to Appellants, but KeyBank also included interest with the amount refunded. Appellants offer no counterargument to this conclusion;[13] they focus instead on whether "KeyBank's failure to pay interest was a breach of the loan."

¶43 Because Appellants do not challenge the trial court's factual finding, and because we conclude that the finding was not clearly erroneous, we affirm on this point.

---

13. Appellants do assert in their reply brief that the trial court "improperly found API had failed to prove damages." But "issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court." *Brown v. Glover*, 2000 UT 89, ¶ 23, 16 P.3d 540.

B.      Breach of Fiduciary Duty, Bad Faith, and Breach of Loan
        Documents

¶44     Appellants argue that the trial court's rulings on their claims of breach of fiduciary duty, bad faith, and breach of the loan documents were erroneous. These claims arose from KeyBank's alleged conduct in failing to fund Draw Request No. 6, failing to cooperate with Appellants' attempts to refinance, and demanding a larger payoff amount than what was actually due.[14] Before addressing these claims as they relate to each of these specific allegations, we must discuss a discrepancy between the trial court's rulings and Appellants' arguments on appeal.

¶45     Appellants brought each of their challenges to the trial court's summary judgment rulings in the context of claims for intentional infliction of emotional distress, lost profits, and fraud. *See supra* Part I. But the trial court also largely disposed of Appellants' breach of fiduciary duty claims on summary judgment. It concluded that "there is no overarching fiduciary duty between a borrower and a lender." It therefore granted summary judgment on all claims of breach of fiduciary duty except for those premised on "the $15,000" payment from Keyes to a KeyBank employee. For trial, any claims resting on "the breach of fiduciary duty" would be "limited to the $15,000, and only to the extent that [Appellants] can show that [they were] entitled to more interest than [they had] been actually paid on the $15,000." And in the trial court's written findings and conclusions, in a section partially titled "Breach of Fiduciary Duty," it explained that "[e]ach of these claims relate to the

---

14. Although Appellants lump together these three causes of action, they do not all apply to each of the three categories of conduct. We do our best to clarify the issues as we address each one.

$15,000 payment to Mr. Preston." The court did not address breach of fiduciary duty in any other context in its trial rulings.

¶46    Nevertheless, Appellants contend that their challenges to the trial court's rulings regarding breach of fiduciary duty stem from the court's written findings of fact and conclusions of law entered after trial. This is incongruous, as their specific challenges have nothing to do with the $15,000 at issue at trial. And because Appellants fail to even clearly identify which of the trial court's rulings they challenge, they have not carried their burden of persuasion on appeal. This is further demonstrated by the only argument we are able to make out on the question of breach of fiduciary duty: Appellants complain, "The Trial Court limited any damages relating to a breach of fiduciary duty to only damages from the failure to replace the stolen $15,000!" From the case law cited following this exclamation, we assume Appellants implicitly challenge the trial court's summary judgment ruling that no fiduciary duty existed.

¶47    Even assuming such an approach was sufficient to be considered adequate briefing, we would affirm. "Ordinarily, no fiduciary relationship exists between a bank and its customer." *State Bank of S. Utah v. Troy Hygro Sys., Inc.*, 894 P.2d 1270, 1275 (Utah Ct. App. 1995). An exception to this general rule exists in lender-borrower relationships when one party has "superiority" over the other; "there must exist a certain inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of the facts involved, or other conditions, giving to one advantage over the other." *First Sec. Bank of Utah, NA v. Banberry Dev. Corp.*, 786 P.2d 1326, 1333 (Utah 1990) (cleaned up). Appellants do not address whether or how this exception would apply in this case, and we thus consider it appropriate to apply the general rule. The trial court was therefore correct in concluding that there was no fiduciary duty to breach.

¶48 We thus turn our attention to the remaining issues—bad faith and breach of the loan documents.

1.      Failure to Pay Draw Request No. 6

¶49 In failing to timely fund Draw Request No. 6, Appellants contend, KeyBank engaged in bad faith. On this point, the trial court agreed. It explained that it "found that the Draw Process Overview was not intended to create an express contract requiring any draw requests to be processed within a fixed period of time" but that "the Draw Process Overview creates expectations that are protected by the covenant of good faith and fair dealing." The trial court went on to find:

> Those expectations include that KeyBank will act on any draw request within a reasonable time. The time frames set forth in the Draw Process Overview create a framework against which any delay in processing can be examined. The facts [of this case] suggest an unreasonable delay in processing Draw Request No. 6.

Thus, while the trial court did not use the term "bad faith," it did conclude that KeyBank's behavior was contrary to the covenant of good faith—a distinction without a difference.

¶50 Critically, however, the trial court concluded, "Notwithstanding this finding, the claim fails because API has proven no damages that resulted from the delay." In other words, the trial court found there was no causation between the delay in funding Draw Request No. 6 and any damages Appellants incurred. "Assessing causation is a question of fact, and a trial court's findings of fact will not be set aside unless clearly erroneous." *Long v. Stutesman*, 2011 UT App 438, ¶ 11, 269 P.3d 178 (cleaned up). Appellants suggest that the trial court's finding regarding causation is erroneous because it "is irreconcilable with other findings."

¶51   The main damages Appellants claim they sustained were costs associated with mechanic's liens filed against the property. They argue that if KeyBank had paid Draw Request No. 6 in a timely manner, the liens "would never have been filed." However, the trial court specifically "found that nonpayment of the draw request did not cause Camco to file a mechanics lien." It also found that API's failure to certify Draw Request No. 8—not KeyBank's delay in funding No. 6—triggered the lawsuit with Camco, for which Appellants sought damages from KeyBank. While Appellants call these conclusions speculation, they do not address myriad factual findings that supported them.

> [B]y neglecting the court's findings, [Appellants] necessarily fail to adequately call into question the factual basis for the district court's ultimate [damages] determination. *Cf. State v. Nielsen*, 2014 UT 10, ¶ 40, 326 P.3d 645 (explaining that, with regard to the marshaling requirement, "a party who fails to identify and deal with supportive evidence will never persuade an appellate court to reverse under the deferential standard of review that applies to such issues"); *Wayment v. Howard*, 2006 UT 56, ¶ 17, 144 P.3d 1147 (presuming that the evidence presented supported the district court's factual findings where the appellant "failed to marshal any of the supporting evidence").

*See Bresee v. Barton*, 2016 UT App 220, ¶ 58, 387 P.3d 536. And the trial court expressly found that the evidence presented at trial "undermined" Appellants' "claims of causation." Thus, the trial court's "detailed factual findings amply support its finding that" Appellants' damages were not caused by KeyBank's delay in funding Draw Request No. 6. *See id.*

2.      Failure to Cooperate with Refinance Process

¶52    The next issue raised stems from Appellants' contention that "KeyBank delayed API's efforts to obtain refinancing." In so doing, Appellants argue, KeyBank acted in bad faith.

¶53    The trial court, in its findings of fact, explained:

> During late 2006 and early 2007, API attempted to refinance its Construction Loan into permanent financing. In connection with the refinance it requested KeyBank verify certain facts with respect to the status of the construction and the Construction Loan. KeyBank declined to provide the verifications on the basis that the facts were inconsistent with the required verification.

It also concluded that nothing in the parties' agreements "required or obligated KeyBank to execute the Lender's Certification or otherwise to 'provide certifications to the long term lender regarding the project in question' as alleged in . . . the Second Amended Counterclaim." And "[w]hen API requested KeyBank's Certifications in connection with its proposed refinance, KeyBank could not make those Certifications because they were inaccurate." The inaccuracies referenced by the trial court included that there was no default on the loan, that construction had been completed according to final plans and specifications, and that there were no mechanic's liens on the property. Accordingly, the trial court concluded that KeyBank had breached no obligation in its behavior during API's attempts to refinance. This conclusion amounts to an implicit finding that KeyBank did not act in bad faith.

¶54    Appellants do not address these findings or conclusions. Instead, they focus the relevant section of their brief—a meager two paragraphs—on reasserting evidence they seem to believe weighed in favor of finding for Appellants on this issue.

Recasting the evidence that was in front of the trial court is insufficient to demonstrate that a court's factual finding was clearly erroneous. *See ProMax Dev. Corp. v. Mattson*, 943 P.2d 247, 255 (Utah Ct. App. 1997) ("To succeed in its challenge to findings of fact, [an appellant] may not simply reargue its position based on selective excerpts of evidence presented to the trial court."), *abrogated on other grounds by Eldridge v. Johndrow*, 2015 UT 21, 345 P.3d 553. Accordingly, we cannot say the findings of fact are erroneous.

3.      Demanding More than Was Due

¶55     Included in the section of their brief dealing with supposed bad faith and breaches of loan documents, Appellants argue that "KeyBank demanded more than was due to payoff the Construction Loan." They do not explain whether this behavior amounted to bad faith or a breach of the parties' agreements. We thus assume that this issue is meant to challenge the trial court's factual findings regarding the payoff amount.

¶56     The trial court found that KeyBank provided proper payoff amounts, was not required to provide the payoff amount within a certain period of time, and assessed contractual amounts in good faith and in accordance with relevant contractual terms. Based on these findings, the trial court concluded that

> [t]he only amounts that were improperly included in the payoff were a few late fees based upon interest payments that were not paid timely during the Construction Loan phase. Ultimately, KeyBank returned those late fees, plus interest at the rate of ten percent. There was no evidence of any ongoing damage to the relationship between API and its takeout lender.

¶57 Nowhere in the relevant section of their brief do Appellants address the trial court's findings or related conclusions. Furthermore, they provide no citation to case law or other legal authority. Instead, they address only the evidence presented that would have supported a finding that "KeyBank failed to give" "a good faith and prompt payoff information when[] requested," thus breaching "the implied covenant of good faith and fair dealing."

¶58 When challenging factual findings on appeal, appellants are expected to carry a heavy burden. Appellants here "appear[] to have misapprehended this burden because [they have] presented no legal arguments as to the sufficiency of the evidence. Rather, [they have] used the appeal as an opportunity to re-argue the factual case presented in the trial court." *ASC Utah, Inc. v. Wolf Mountain Resorts, LC*, 2013 UT 24, ¶ 19, 309 P.3d 201 (cleaned up). We accordingly reject their challenge.

## IV. Denial of Mistrial Motion

¶59 Finally, Appellants argue that the trial court erred by not granting them a new trial. Appellants' position is that the court should have granted them a new trial because of "[i]rregularity in the [proceedings] of the court, jury or [opposing] party, or any order of the court, or abuse of discretion by which [a] party was prevented from having a fair trial." (Quoting Utah R. Civ. P. 59(a)(1).)

> This rule is only in force subject to the provisions of Rule 61, which states: "No error in either the admission or the exclusion of evidence, and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties, is ground for granting a new trial or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at

every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." The question before us, then, is whether the admitted evidence affected the substantial rights of the parties. If so, it was grounds for a new trial. If not, the trial court did not abuse its discretion in denying the motion for a new trial.

*Barrientos ex rel. Nelson v. Jones*, 2012 UT 33, ¶¶ 15–16, 282 P.3d 50 (cleaned up).

¶60 The problems with Appellants' challenge on appeal are threefold: First, Appellants did not move for a new trial under rule 59. Second, Appellants do not identify what irregularities occurred during the trial that would justify a new trial. Third, Appellants make no mention of how "the substantial rights of the parties" were affected, thus warranting a new trial.

¶61 Following trial, Appellants filed a Motion for Mistrial. The motion and its supporting memorandum made no mention of rules 59 or 61, nor did they use the term new trial. The trial court ruled that Appellants had "not provided the Court with any binding or persuasive legal authority which supports the proposition that a party can move for a mistrial over six months after the trial ha[d] concluded. Therefore, the Court reject[ed] [Appellants'] Motion on those grounds alone." Appellants make no mention of this rationale for the trial court denying their motion. "This court will not reverse a ruling of the trial court that rests on independent alternative grounds where the appellant challenges only one of those grounds." *Salt Lake County v. Butler, Crockett & Walsh Dev. Corp.*, 2013 UT App 30, ¶ 28, 297 P.3d 38. We thus affirm on this point.

¶62 But even assuming that we were inclined to reach the merits of Appellants' argument on appeal, we would not be able to do so. Appellants do not explain how rules 59 and 61 of the

Utah Rules of Civil Procedure should operate to support their position. Thus, we have no occasion to reverse the trial court on this basis.

CONCLUSION

¶63   In short, we affirm. Appellants have not carried their burden of persuasion on appeal. Their arguments suffer from inadequate briefing or otherwise fail as a matter of law.

———————